WEBB v. SNOW et al.

No. 6381. Decided December 18, 1942. (132 P. 2d 114.)

See 6 C. J. S., Assault and Battery, sec. 49; 4 Am. Jur., 186.

*Judd, Ray, Quinney & Nebeker* and *Thornley K. Swan,* all of Salt Lake City, for appellants.

*Raymond R. Brady* and *Joseph R. Haas,* both of Salt Lake City, for respondent.

McDONOUGH, Justice.

Aileen Webb, plaintiff and respondent, brought an action in the district court against the defendants and appellants for alleged assault and battery which took place on the loading platform of an amusement concession known as the "giant racer" at Saltair Beach on the night of June 22, 1940. The jury returned a verdict in the sum of $5,022.50, the entire amount claimed by plaintiff as damages at the time the case was submitted to the jury. The defendants by this appeal assign as error the verdict, the judgment on the verdict, the order denying the motion for a new trial, and errors in instructions to the jury, and the refusal of the

court to give any instructions on the defendants' theory of the case.

There appears to be little or no dispute as to the following facts: The giant racer is situated at said recreational resort, but admission to the beach does not entitled a patron to ride on the racer. To accommodate patrons who desire to ride on the giant racer, there is a series of steps which lead up to an entrance platform about 33 feet in width, and together with the exits and operating platform and tracks, has an overall measurement of about 120 feet. About 50 feet south from the general entrance to the platform there are two wing fences through which all patrons must go in order to ride on the concession. Within these wing fences which are set at angles, separated by an enclosure for two sets of tracks, are two avenues down which the patrons must come to gain access to the cars. Each avenue is about 6½ feet in width, one being on the east side and the other on the west side of the tracks.

There is an operating platform between the tracks, which is about 18 inches lower than the platforms from which patrons step into the cars. A fence on the outside of each track separates the avenues from the tracks, and extends from the north end of the enclosure a distance of about 25 feet. From this point south on each side there is an open space without any fence to enable the patrons to obtain easy access to the cars while loading, and the converse while unloading. The cars on only one side are operated when the number desiring to ride can be accommodated thereby. At the time the altercation occurred on the night of June 22, 1940, only the west track was in use, and patrons were received only from the west avenue.

There is considerable dispute about most of the events which occurred, but there are some facts concerning which there is little disagreement. There were four young men who had charge of the loading and unloading and starting of the cars, as well as the collection of fares which were taken up when patrons entered the cars. About 10:30 p.m.

the plaintiff Aileen Webb, her husband, Kenneth Webb, Bernard L. Bettilyon, brother of plaintiff, and his wife, came over to the giant racer platform. They all observed that only the west track was in operation and no cars were then in use on the east tracks. The crowd of prospective patrons waiting to board the cars was in the west avenue. When Bernard L. Bettilyon, and the three persons above named, came within the enclosure on the platform created by the wing fences, instead of going into the west avenue in line with other patrons, they stood for a few minutes north of the fence which constitutes the north boundary of the enclosure which separates the tracks from the two avenues. Bettilyon then proceeded to enter the east avenue, according to his own testimony, for the purpose of inducing the boys in charge to start up the cars on the east track. He went south to the point where the fence separating the tracks from the east avenue ends, and he sat on his heels and some remarks passed back and forth between him and one of the employees. He was there for several minutes, and he leaned over and rested his arm on one of the cars standing on the east tracks. There is no dispute as to the fact that one of the employees ordered Bettilyon away, and that Bettilyon rejoined with "Go jump in the lake," or similar words; but there is considerable dispute and conflict in the evidence as to all that was said and done prior to the latter remark and what took place between the retort of Bettilyon and the altercation which ensued.

Bettilyon testified that when he told the employee of defendant to "go jump in the lake," he was somewhat angry, and he arose from a squatting to a standing position, and one of the employees leaped across the cars and tracks and came over to him and gave him a rough shove to the north. Bettilyon testified he then immediately struck at the man and missed him, and the fight began; that two others joined in the fight and numerous blows were rained on him. He claimed that Kenneth Webb then intervened and tried to separate the men, when Webb was hit and

the fight started all over again. It is admitted that some men who were not employees joined in the fight, but there is considerable conflict as to who was hit and what blows were struck. Kenneth Webb testified that when he was hit he dropped to his knees.

Bettilyon was struck a blow which knocked him to the floor, and when Kenneth Webb dropped to his knees, plaintiff stepped out from where she was standing said, "You can't do that to my husband," and she slapped Jack Lampere, one of the employees of defendants, in the face. He quickly struck a blow with his fist which caused her to fall to the floor. Witnesses for plaintiff claim she was rendered unconscious, and that the employees of defendants disappeared without extending any aid or assistance. Mr. Webb got to his feet and came to the assistance of his wife. The movement of the participants was toward the north.

Before giving any detail as to the injuries which plaintiff testified she sustained, we present a synopsis of the material testimony of defendants which conflicts with the testimony of plaintiff. According to such testimony, when Bettilyon came south on the east avenue, Jack Lampere who was taking care of one of the cars on the west tracks and collecting fares, motioned him to go back and over to the west side. The other three did not come down the east avenue with Bettilyon at that time, but Bettilyon kept right on going until he reached the end of the fence. Lampere then got the car he was loading on its way, and he told Bettilyon to go back and get on the other side, but Bettilyon merely asked, "What other side?" and he failed to turn back, and there was some further conversation. Earl Cochran who was tending one of the cars then told Bettilyon to go around to the other side, but the latter ignored the request. Cochran again told Bettilyon to go around on the other side, whereupon the latter invited Cochran to put him out or put him around on the other side, to which Cochran replied, "I will do that," and crossed the east tracks onto the east avenue and facing Bettilyon again told him he would have

to leave. Whereupon Bettilyon struck at him with his fist. Cochran then took hold of Bettilyon's arms and tried to push him out, but the latter broke loose. Cochran got out of his way as best he could Bettilyon striking at him.

Jack Lampere then came over and Bettilyon struck at him, and the latter then hit Bettilyon. At that point Kenneth Webb, husband of plaintiff, came down the avenue and struck Lampere who thereupon hit Webb. At this juncture, a friend of Cochran, who had been riding on the racer but who was not an employee of defendants, stepped over and took hold of Bettilyon and said he would have to leave. The fight had then ceased, but Bettilyon wrenched loose and started to fight again, and Lampere struck Bettilyon a blow which knocked the latter to the floor. Another employee of defendants then struck Webb. A stranger entered the fray and as Lampere took a couple of steps toward Webb, a hand came around his shoulder and hit him in the face. He turned around quickly and with his open hand struck in the direction from which the blow had come without looking to see who it was, and the first thing he heard was "Who hit that woman?" He then turned and saw Mrs. Webb sitting on the floor with her hands to her face crying. Cochran and Lampere testified that as soon as mention was made that a woman was hit they saw a woman sitting on the floor crying; that she was never stretched out or unconscious. The fracas thereupon ended.

In her original complaint plaintiff claimed $1,000 general damages, $5,000 punitive damages, and special damages for injuries to articles of clothing. This complaint was filed some three months subsequent to the alleged battery. Some three and one-half months after the action was commenced, she filed an amended complaint in which she alleged that she was pregnant at the time the alleged battery was committed, and that as a result of injuries thereby sustained she suffered a miscarriage six days later, losing her unborn child and suffering as a consequence pain and nervous shock. She asked $5,000 general damages in addi-

tion to punitive and special damages. The verdict mentioned at the outset of this opinion resulted.

The assignments of error which assail the instructions of the court and the court's refusal to instruct as requested by defendants will first be considered. Appellants predicate error upon the refusal of the court to instruct upon separate requests (1) that there was no substantial evidence that plaintiff was pregnant at the time of the alleged assault and battery, or that she suffered a miscarriage; and (2) that there was no substantial evidence that the miscarriage, if it occurred, was caused by the alleged assault and battery. However, we are of the opinion that the evidence in the record including the testimony of competent medical experts, one of whom was plaintiff's attending physician, was such as to preclude the giving of either of such requested instructions.

Other assignments relate to exceptions taken to parts of Instruction No. 7 which reads as follows:

"The court instructs you that if you believe from the evidence that the plaintiff was pregnant at the time she was *rendered unconscious* by the blow delivered by one of the defendants' employes, and as a result of said blow and being knocked to the floor she suffered a miscarriage and thereby the loss of her unborn child, you may award her money damages for the *loss of said unborn child.*" (Italics added.)

The foregoing instruction disregarded entirely the fact that there was considerable dispute and conflict in the evidence. The instruction, standing alone, would amount to an instruction to find in favor of the plaintiff if the jury found that plaintiff was pregnant at the time she was struck, and if they also found that a miscarriage resulted. The instruction assumes that defendants' employees were to blame for what occurred, and that the evidence was uncontradicted as to the following: (1) That plaintiff was "rendered unconscious" by the "blow," and (2) that she was knocked to the floor. The instruction is so worded that it indicated to the jury a belief on the part of the court that defendants' employees were blameworthy

irrespective of the acts of plaintiff. As stated in *State* v. *Seymour*, 49 Utah 285, 163 P. 789, 792:

"Courts, in charging jurors, should be very careful not to assume any material fact or facts. Jurors, who are laymen, are always eager to follow the opinion or judgment of the court, and if the court assumes any material fact in the charge, the jurors are most likely to follow the assumptions of the court. Indeed, we must assume that such is the case unless the record clearly shows the contrary."

The foregoing statement was quoted with approval in *State* v. *Hanna*, 81 Utah 583, 21 P. 2d 537, at page 540. While both were criminal cases, the principle announced therein applies with equal force to jury trials in civil cases. The court must not resolve conflicts in evidence for the jurors or indicate what particular testimony the trial court believes correctly states the facts. Where there is a conflict in the evidence the jurors must weigh the evidence and determine the credibility of witnesses, and decide what are the facts.

The foregoing charge to the jury was also erroneous for the further reason it states that the jury might award damages "for the loss of said unborn child" if they found that a miscarriage resulted from injuries. Instruction No. 10 contains the same prejudicial error:

"The court instructs you, members of the jury, that if you find the issues in this case in favor of plaintiff and against the defendants, you may find for the plaintiff such a sum as will compensate her for the following damages, not to exceed $5,000.00:

"1. The actual personal injuries which she suffered;

"2. The consequent pain and suffering which she suffered as a result of her physical injuries;

"3. *Money damages for the loss of her unborn child as a result of said miscarriage.*

"* * *." (Italics added.)

The latter instruction assumes there was a miscarriage, and it authorizes the jury to assess damages for the "loss

of her unborn child." Even considering the evidence in the light most favorable to plaintiff, if plaintiff was actually pregnant on June 22, 1940, and the miscarriage occurred about six days later, she would have been pregnant for a very short period of time. While injuries resulting in a miscarriage are actionable, and compensation may be awarded for the physical and mental sufferings experienced by a woman who has a miscarriage by reason of injuries caused by the wrongful acts of others, damages are not awarded for "loss of the unborn child" itself. There is no basis for the part of the instruction given by the court. See 15 Amer. Jur., p. 490, sec. 82; *Wallace* v. *Portland Ry. L. & P. Co.*, 88 Or. 219, 159 P. 974, 170 P. 283; *Vitale* v. *Biando*, Mo. App., 52 S. W. 2d 24. Counsel for respondent concede in their brief that they have been unable to find any authority to the contrary.

Exception was taken to Instruction No. 4, which reads as follows:

"The court instructs you, if you find from the evidence that the plaintiff's admission to Saltair Beach was paid, that she was a guest and had a right to remain there as long as said resort remained open to the public that evening."

The instruction was not responsive to the issues. In the first place, it was admitted that the entrance fee to the beach did not entitle plaintiff or any one else to ride on the giant racer or access to any of the other concessions without charge. The platform of the giant racer was erected to facilitate reception of patrons. In order to become a guest on such concession it was necessary for all prospective patrons to go to the proper place and to get in the cars which were then being used. There is no dispute as to the fact plaintiff knew that only the west tracks were in use at the time she and the other three in her group approached the giant racer. The only purpose Bettilyon had either in his own behalf or as representative of the group in going down the east avenue on the side where the cars were

not in operation was to induce the operators to change their plan and program of operation. These people admittedly were not invited to come down the east avenue, and it was quite apparent that if they wanted to ride on the racer they would have to stand in line and await their turn. Defendants had no duty to receive prospective patrons on the east side, and even if there had been a large crowd defendants would not have had any legal duty to provide additional facilities merely because there might have been a clamor for added service.

We do not apprehend that Bettilyon was either a licensee or an invitee as far as his actions were concerned after coming down the east avenue, and refusing to withdraw after making inquiry. The defendants were entitled to control and regulate their amusement concession. Neither plaintiff nor any other person in the group had paid any admission price for any privilege of riding on the giant racer, and they had not put themselves in a position to offer to pay such admission price for the reason they knew that the method of operation then in use required patrons to come down the west avenue where the cars were in service. The instruction complained of was misleading, and in the absence of other instructions defining the right of defendants to eject trespassers, was prejudicial.

Appellants complain by appropriate assignments of error, that the court gave instructions which expounded the plaintiff's theory of the case and assumed as proved beyond dispute, matters which were greatly in dispute. Exceptions were taken to the following instruction:

"The court instructs you if you find from the evidence that the plaintiff was apprehensive that her husband and brother, or either of them, were in danger of bodily harm and that she interceded in the affray in order to try to protect either or both of them, that she was justified in doing so. If you further find from the evidence that as a result of her participation in the affray she was rendered unconscious by a blow from one of the defendants' employees, the mere fact that she participated in the affray would not bar her from recovering damages from the defendants."

The instruction assumed that plaintiff's husband and brother were unlawfully assaulted and battered, a matter which is disputed by the evidence. This leads us to the other objections and assignments of error, which in substance are that the trial court disregarded the conflict and the dispute in the evidence presented by the opposing parties and instructed the jury only on the theory of the case in the light of plaintiff's evidence.

The appellants requested a number of instructions on their theory of the case, which were denied. If the trial court had covered in substance the requested instructions, no error could be predicated for failure to give instructions even if properly worded and appropriate in form and content. However, the instructions which the trial court gave, disregarded the version of the facts as testified to by witnesses called by defendants, and the instructions assumed that the facts were not seriously disputed, and that they were as testified to by plaintiff's witnesses.

The denial of the requests for specific instructions on the defendants' theory of the case was tantamount to advising the jury: (1) That Bettilyon had a right to come down the east avenue irrespective of the warnings given him, and (2) that regardless of how he used his fists on the employees of defendants, and regardless of whether or not the husband of plaintiff voluntarily came into the fighting or even if Bettilyon was the aggressor, that plaintiff was justified in voluntarily leaving a place of safety to strike Jack Lampere if she felt her husband or brother or both might be in danger of injury.

If plaintiff's husband or her brother or both of them were engaged in a wrongful act or were the aggressors in the altercation, it is difficult to see how plaintiff could claim a right to enter into the affray, even if she thought her husband or brother was in some immediate danger of injury, if such danger was the result of his own misconduct. The rule applicable in such cir-

cumstances is stated as follows in 6 C. J. S., Assault and Battery, § 19, pages 815, 816:

"A person interfering on another's behalf enjoys no further immunity than the person attacked. Hence, both must be free from fault in bringing on the difficulty, the apparent danger must be such as to induce one exercising a reasonable and proper judgment to interfere to prevent a consummation of the injury * * *. When the danger is over, justification for the use of violence is at an end. * * *

"Accordingly, if the person defended was not free from fault, his protector cannot claim immunity. Furthermore, before a person is justified in using force to protect members of his family, the apparent danger must be such as to induce one exercising a reasonable and proper judgment to interfere to prevent a consummation of the injury, and no more force must be used than is reasonably necessary for such purpose. If the danger has passed, justification for the use of violence is at an end."

The evidence produced by defendants tended to show that the plaintiff's husband and brother were not free from fault; that before plaintiff struck Lampere, her brother had been knocked to the floor, and that her husband had sagged to his knees, and that there was no further blow being directed at any of them. The testimony of Lampere was that he was struck in the face from the rear while he was standing; and that when struck he turned and struck quickly with his open hand; that he did not know plaintiff was the one who had hit him, and that he did not use any more force than at the moment he thought was necessary to repel the assault.

If the fighting which was going on when her husband was involved, ceased entirely as far as any action on the part of the employees of defendants was concerned, plaintiff would not have been justified in striking Lampere when doing so was not an act of self-defense nor provoked by any conduct on his part. If there were any strangers participating, what they did on their own volition or in the attempt to restore order, not under any control or direction of any employee of defendant, could not operate to justify an assault by plaintiff on any

employee of defendants. The jurors should have been instructed on the defendants' theory of the case as well as as on the plaintiff's theory. In *Pratt* v. *Utah Light & Traction Co.*, 57 Utah 7, 169 P. 868, 869, this court said:

"Each party to a suit is entitled to have his theory, when there is evidence to sustain it, submitted to the jury and the judgment of the jury on the facts tending to support such theory assuming always that there is testimony offered to support the same, and this court has so held in *Hartley* v. *Salt Lake City*, 41 Utah 121, 124 P. 522, where, speaking through Straup, J., it is said:

" 'There are two parties to a lawsuit. Each, on a submission of the case to the jury is entitled to a submission of it on his theory and the law in respect thereof. The defendant's theory as to the cause of the accident is embodied in the proposed requests. There is some evidence, as we have shown, to render them applicable to the case. That is not disputed. We think the court's refusal to charge substantially as requested was error. That the ruling was prejudicial and works a reversal of the judgment is self-evident * * *.' " **See** also *Morgan* v. *Bingham Stage Lines Co.*, 75 Utah 87, 283 P. 160.

It is contended by counsel for respondent that the evidence was of such a character that it is unlikely that the jury would have awarded judgment in favor of defendants, had the court instructed on defendants' theory of the case. If the result could not have been affected by the error of the trial court it would not be prejudicial; but in this case we are unable to say that the error was not prejudicial. It would be impossible to tell whether the jury under proper instruction would have returned the same verdict, a verdict in a lesser amount for plaintiff, or a verdict in favor of defendants. The instructions tended to convey to the jury erroneous conceptions as to the law, and they tended to convey the impression that the defendants had not presented any substantial evidence amounting to a defense.

Other errors are assigned, which are not likely to occur again on a retrial. This is particularly true in view of respondent's concessions relative thereto, short, however, of any admission that they constitute reversible error.

Consequently such alleged errors need not be discussed.

For the reasons stated, the judgment of the trial court is reversed, and the district court is directed to set aside the verdict and to grant a new trial. Costs to appellants.

MOFFAT, C. J., and WOLFE and LARSON, JJ., concur.

PRATT, J., on leave of absence.