Argued September 10, 1973, reversed and remanded January 31,
petition for rehearing denied by opinion March 21, 1974

# LIBBEE, *Appellant, v.* PERMANENTE CLINIC
## ET AL, *Respondents.*
518 P2d 636
520 P2d 361

*Theodore S. Bloom*, Portland, argued the cause for appellant. With him on the brief were Martindale, Ruben & Rothman, Portland.

*William L. Hallmark*, Portland, argued the cause for respondents. With him on the brief were McMenamin, Jones, Joseph & Lang, Portland.

TONGUE, J.

This is an action for wrongful death brought on behalf of the estate of a baby that died in defendant's hospital shortly before its birth. Plaintiff appeals from the granting of a directed verdict in favor of defendant Kaiser Foundation Hospital.[1]

The facts, insofar as they relate to the issues raised by this appeal, are substantially as follows, giving plaintiff the benefit of all favorable evidence, as required in such a case.[2]

Michealeen Libbee was admitted to the hospital on August 11, 1969, at about 2:30 p.m. for the delivery of her baby. At that time she was six weeks and five days overdue. At about 7:30 p.m. Dr. George saw her, ruptured her membrane, and noted that the amniotic

[1] No error is claimed for the granting of a directed verdict in favor of defendant Permanente Clinic or in favor of three doctors who were partners in that clinic.

[2] Archer v. Rogers Construction, 252 Or 165, 169, 447 P2d 380 (1968).

fluid was "quite stained," i.e., that there was meconium in the amniotic fluid.[9]

Mrs. Libbee was then monitored, including a check of the fetal heartbeat, approximately every half-hour by one of defendant's registered nurses until 11 p.m., when that nurse went off duty and her duties were assumed by another registered nurse employed by the hospital. During that period Mrs. Libbee made very little progress in her labor.

The second nurse testified that she continued to monitor Mrs. Libbee every half-hour and that entries were made on the hospital records to that effect. Mrs. Libbee testified, however, that after the nurse checked her at about 12:30 a.m., she felt a different kind of a pain at about 1 a.m., and rang the bell to summon the nurse. She also testified that the nurse then "stuck her head in" and said that she would be back "in a moment," but did not return until about 1:30 a.m.

At that time the nurse again monitored Mrs. Libbee and found that there were no fetal heart tones, as found on all previous occasions. A doctor was then summoned and a Caesarean operation was performed, but the child was dead upon delivery.

Medical testimony was offered by plaintiff that under these circumstances, including the discovery of meconium in the amniotic fluid, the fetal heartbeat should have been monitored every five minutes. In addition, the nurse herself admitted that it was "common practice" in defendant's hospital for an LPN

---

[9] Meconium is "The first intestinal discharges of the newborn infant, greenish in color and consisting of epithelial cells, mucus, and bile." Stedman's Medical Dictionary (3d Lawyers ed 1972) 750.

(Licensed Practical Nurse) to monitor the heart tones of the patient "quite frequently." She also admitted that she was aware of the fact that the amniotic fluid was "stained" and that this "could be a problem for the baby."

In addition to contending that this evidence was insufficient to go to the jury on the issue of its negligence, the hospital raises the threshhold question whether an action for wrongful death of a stillborn baby can be maintained in Oregon—a question never before decided by this court.

1. *An action for wrongful death of a stillborn child can be maintained in Oregon.*

■ In *Mallison v. Pomeroy,* 205 Or 690, 697, 291 P2d 225 (1955), we held that a "viable" unborn child is a "person" for the purposes of Article I, § 10, of the Constitution of Oregon, which guarantees "every man * * * [a] remedy by due course of law for injury done [to] him in his person * * *."[4] This court held that it had a cause of action for personal injuries sustained by it while it was in its mother's womb, causing cerebral palsy.

In so holding this court chose to follow what we referred to as "the best reasoned modern judicial opinions," despite substantial authority to the contrary.

Among the decisions cited with approval in *Mallison* (at 692) is *Verkennes v. Corniea,* 229 Minn 365, 38 NW2d 838 (1949). In that case, as in this, the action was for the wrongful death of an unborn child. In one

---

[4] A "viable" unborn child is one which has developed in its mother's womb to the point that it is capable of independent existence outside its mother's womb.

of the first and leading cases sustaining the right to recovery in such an action the court said (at 38 NW2d 840), in quoting from another case:

> " '* * * The wrongful act which constitutes the crime may constitute also a tort, and, if the law recognizes the separate existence of the unborn child sufficiently to punish the crime, it is difficult to see why it should not also recognize separate existence for the purpose of redressing the tort.' "

The court in *Verkennes* then went on to hold (at 841):

> "* * * It seems too plain for argument that where independent existence is possible and life is destroyed through a wrongful act a cause of action arises under the statutes cited."

Since *Verkennes* the courts of 19 jurisdictions now expressly permit an action for the death of a viable unborn child.⑧ Twelve jurisdictions expressly prohibit such actions.⑨

---

⑧ *Connecticut:* Hatala v. Markiewicz, 25 Conn Sup 358, 224 A2d 406 (1966); Gorke v. Le Clerc, 23 Conn Sup 256, 181 A2d 448 (1962). *Delaware:* Worgan v. Greggo & Ferrara, Inc., 50 Del 258, 128 A2d 557 (1956). *Georgia:* Porter v. Lassiter, 91 Ga App 712, 87 SE2d 100 (1955). *Illinois:* Chrisaforgeorgis v. Brandenberg, 55 Ill 2d 368, 304 NE2d 88 (1973). *Indiana:* Britt v. Sears, 277 NE2d 20 (Ind App 1971). *Kansas:* Hale v. Manion, 189 Kan 143, 368 P2d 1 (1962). *Kentucky:* Mitchell v. Couch, 285 SW2d 901 (Ky 1955); Rice v. Rizk, 453 SW2d 732 (Ky 1970). *Louisiana:* Valence v. Louisiana Power & Light Co., 50 So 2d 847 (La App 1951). *Maryland:* Use of Odham v. Sherman, 234 Md 179, 198 A2d 71 (1964). *Michigan:* O'Neill v. Morse, 385 Mich 130, 188 NW2d 785 (1971). *Minnesota:* Verkennes v. Corniea, 229 Minn 365, 38 NW2d 838 (1949). *Mississippi:* Rainey v. Horn, 221 Miss 269, 72 So 2d 434 (1954). *Nevada:* White v. Yup, 85 Nev 527, 458 P2d 617 (1969). *New Hampshire:* Poliquin v. MacDonald, 101 NH 104, 135 A2d 249 (1957). *Ohio:* Stidam v. Ashmore, 109 Ohio App 431, 167 NE2d 106 (1959). *South Carolina:* Fowler v. Woodward, 244 SC 608, 138 SE2d 42 (1964); Todd v. Sandidge Construction Company, 341 F2d 75 (4th Cir 1964). *West Virginia:* Baldwin v. Butcher, 184 SE2d 428 (W Va 1971). *Wisconsin:* Kwaterski v. State Farm Mut. Auto-

The principal reasons stated for prohibiting such actions are as follows:

(1) *Precedent.* This reason no longer applies because the weight of authority now favors recovery.

(2) *An unborn child has no judicial existence apart from its mother.* It is now recognized that there is no medical or scientific basis for such a proposition and it was expressly rejected by this court in *Mallison,* at least with respect to a viable unborn child. It has been predicted that "the requirement of viability will be scrapped,"[7] but that question need not be decided in this case, which involved a clearly "viable" child.

---

mobile Ins. Co., 34 Wis 2d 14, 148 NW2d 107 (1967). *District of Columbia:* Simmons v. Howard University, 323 F Supp 529 (D DC 1971) (fetus died in childbirth at full term).

See also Speiser, Recovery for Wrongful Death 355-56, § 431 (1966); Annot., 15 ALR3d 992 (1967); Wrongful Death and the Stillborn Fetus—A Current Analysis, 7 Houst L Rev 449 (1970). See generally, Prosser, Law of Torts (4th ed 1971) 335-38, § 55.

[6] *California:* Norman v. Murphy, 124 Cal App 2d 95, 268 P2d 178 (1954); Bayer v. Suttle, 23 Cal App 3d 361, 100 Cal Rptr 212 (1972). *Florida:* Stokes v. Liberty Mutual Insurance Company, 213 So 2d 695 (Fla 1968). *Iowa:* McKillip v. Zimmerman, 191 NW2d 706 (Iowa 1971). *Massachusetts:* Leccese v. McDonough, — Mass —, 279 NE2d 339 (1972). *Nebraska:* Drabbels v. Skelly Oil Co., 155 Neb 17, 50 NW2d 229 (1951). *New Jersey:* Graf v. Taggert, 43 NJ 303, 204 A2d 140 (1964). *New York:* Endresz v. Friedberg, 24 NY2d 478, 301 NYS2d 65 (1969). *North Carolina:* Gay v. Thompson, 266 NC 394, 146 SE2d 425 (1966). *Oklahoma:* Padillow v. Elrod, 424 P2d 16 (Okla 1967). *Pennsylvania:* Marko v. Philadelphia Transportation Co., 420 Pa 124, 216 A2d 502 (1966). *Tennessee:* Durrett v. Owens, 212 Tenn 614, 371 SW2d 433 (1963); Hogan v. McDaniel, 204 Tenn 235, 319 SW2d 221 (1958). *Virginia:* Lawrence v. Craven Tire Co., 210 Va 138, 169 SE2d 440 (1969). A Missouri case denied recovery to a fetus' grandparents on the ground that damages were too remote. Acton v. Shields, 386 SW2d 363 (Mo 1965). A frequently cited Alaska case involved a nonviable fetus. Mace v. Jung, 210 F Supp 706 (D Alas 1962).

[7] Speiser, Recovery for Wrongful Death, 361, § 4.33. See also Prosser, Law of Torts (4th ed 1971) 337, § 55.

(3) *Permitting such actions would open the door to fraudulent claims and proof of a causal connection and of pecuniary damages would be speculative.*

The speculative nature of the proof of pecuniary damages on the death of an unborn child is one of the reasons why some courts deny recovery in such cases. In Oregon, however, the Wrongful Death Act has now been amended so as to no longer limit damages in actions under the statute to pecuniary loss. Thus, effective January 1, 1974, ORS 30.020 now includes loss of society and companionship to the parents of a child as an item of damages. (Oregon Laws 1973, ch 718.) The measure of damages in this case may or may not be limited to those provided for under ORS 30.020 prior to that amendment. This, however, is no reason to hold that the unborn decedent in this case was not a "person" for the purpose of that statute.

To the same effect, courts of states which permit recovery in such cases have applied the usual rule to the effect that once a substantive right of a person is recognized, that right cannot then be denied because of possible difficulties in proof[8] and that if the common law has vitality it should be elastic enough to provide safeguards against fraudulent and speculative claims and to adapt itself to the facts of life in our modern society.[9]

■ Even under the previous provisions of the Oregon Wrongful Death Act this court has recognized that the ultimate issue in an action for wrongful death

---

[8] Stidam v. Ashmore, 109 Ohio App 431, 167 NE2d 106, 108 (1959).

[9] Kwaterski v. State Farm Mut. Automobile Ins. Co., 34 Wis 2d 14, 148 NW2d 107, 111 (1967).

is "the value of the life lost,"[10] and that the speculative nature of proof of pecuniary damage in wrongful death actions is no reason to deny the right of a plaintiff to have such an action submitted to the jury, much less to deny the existence of the substantive right to bring such an action.[11] Furthermore, the purpose of a Wrongful Death Act is to provide such a remedy whenever, if death had not ensued, there would have been an action for damages.[12]

■ Suppose, as did the court in *Stidam v. Ashmore,* 109 Ohio App 431, 167 NE2d 106, 108 (1959), the following hypothetical case: A mother bears twins. One is born alive, but immediately dies because of negligent conduct of a hospital. The other dies immediately before birth as the result of the same negligent conduct. Or suppose, as a second hypothetical case, two different mothers, each with a child about to be delivered, one of which is born alive and then dies, while the other dies immediately before birth, each as the result of similar negligent conduct by the hospital. As the court said in *Stidam* (at 167 NE2d 108): "* * * [I]t would be absurd if no recovery could be had for such injuries, unless those injuries were not so severe as to cause death before birth." To the same effect, see *Kwaterski v. State Farm Mut. Automobile Ins. Co.,* 34 Wis 2d 14, 148 NW2d 107, 110 (1966).

---

[10] See Carlson v. Oregon Short Line Ry. Co., 21 Or 450, 459, 28 P 497 (1892), as discussed in Goheen v. General Motors Corp., 263 Or 145, 176, 502 P2d 233 (1972). This court also recognized in Goheen (at 177) that "Pecuniary loss, * * * does not require loss of money or specie, as such."

[11] See Lane v. Hatfield, 173 Or 79, 143 P2d 230 (1943), involving the death of a seven-year-old child, and Prosser, Law of Torts (4th ed 1971) 908-09, § 127.

[12] O'Neill v. Morse, 385 Mich 130, 188 NW2d 785, 786 (1971).

Under the rule of *Mallison,* we would be required to hold that an action could be brought for the wrongful death of the first child in each hypothetical case on the ground that it was a "person" while yet unborn and at the time of the injury causing its death, despite any problems of proof of causation and pecuniary damage. We find no logical basis for distinction under which we could properly hold that no action can be brought for the wrongful death of the second child in each case despite the fact that it was also a "person" at the time of the injury causing its death.

While we recognize that some courts have denied recovery in such cases, after studying this problem we believe that the more persuasive reasons are those adopted by the majority of courts which now recognize a right of action in such cases. We also believe that in view of our previous holding in *Mallison* to the effect that a viable unborn child is a "person" for the purpose of being entitled to remedy by due course of law for injuries to his person, we cannot properly hold, without overruling *Mallison,* that there can be no remedy when such an injury results in death immediately before birth, as in this case.[9]

---

[9] We recognize, as pointed out by defendants, that in our decision in Mallison v. Pomeroy, 205 Or 690, 697, 291 P2d 225 (1955), reference was made to ORS 111.010 (relating to posthumous children for purposes of descent and distribution); to ORS 114.250 (allowing a child born after the testator's death to be treated as a pretermitted heir); and to ORS 163.060 (providing that abortion would be deemed to be manslaughter unless necessary to preserve the life of the mother) and that those statutes have since been repealed or amended. ORS 112.075 now limits inheritance to persons conceived before decedent's death and "born alive." ORS 112.045 now defines a pretermitted child as one born after the execution of a will and who survives the testator. ORS 435.415 permits abortions under less restricted conditions. However, violation of these conditions to the extent not protected by Roe v. Wade,

We also recognize that the Supreme Court of the United States, in *Roe v. Wade,* 410 US 113, 93 S Ct 705, 35 L ed 2d 147 (1973), has held (at 410 US 158) that a fetus is not a "person" for the purpose of the Fourteenth Amendment of the Constitution of the United States, and that states may not enact statutes which prohibit abortions during the first "trimester."[⑩] The Court recognized, however, (at 410 US 163-64), that after a fetus has become "viable" a state may prohibit abortions altogether, except those necessary to preserve the life or health of the mother and (at 410 US 163) that "State regulation protective of fetal life after viability * * * has both logical and biological justifications." It follows that the decision in *Roe* is entirely consistent with our previous decision in *Mallison* to the effect that a viable child is a "person" entitled to the protection of Article I, § 10, of the Constitution of Oregon.

For all of these reasons, we hold that the trial court was not entitled to direct a verdict in favor of defendants in this case on the ground that plaintiff had no right to bring an action for the wrongful death of the child who was the decedent in this case.

---

410 US 113, 93 S Ct 705, 35 L ed 2d 147 (1973), is penalized by ORS 435.455.

While these changes in Oregon statutes are of interest, we do not consider them to be controlling. Moreover, the Oregon legislature has made no corresponding change in its use of the word "person" for the purpose of the Wrongful Death Act (ORS 30.020), although it made other substantial changes in that statute in both 1967 (Oregon Laws 1967, ch 544) and in 1973 (Oregon Laws 1973, ch 718).

[⑩] For criticism of that decision, see Tribe, The Supreme Court 1972 Term, 87 Harv L Rev 1, 4 (1973); and Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L J 920, 924 (1973).

2. *Plaintiff was entitled to submit to the jury the issue whether defendant's nurse was negligent in failing to properly monitor the child's heartbeat while its mother was in labor prior to delivery.*

■ In addition to other allegations of negligence, plaintiff's complaint alleged that defendant Kaiser Foundation Hospital was negligent in that it "failed to properly and timely monitor * * * the child's heartbeat while decedent's mother was in labor prior to delivery."

Defendants contend that there was no testimony to establish that defendant's nurses (as distinct from the doctors) "should have recognized that additional care was needed" and that this could only be established by expert testimony unless the doctors had given such instructions to defendant's nurses.

Plaintiff responds by contending, in effect, that this was not a matter requiring expert testimony and that, in any event, there was evidence from which the jury could properly have found that defendant's nurses were aware of the fact that there was a "problem" in this case and recognized that monitoring of the child's heartbeat was needed at least every half-hour.

There was evidence that under the circumstances presented by Mrs. Libbee's pregnancy it would have been customary *medical* practice to monitor the fetal heartbeat at least every half-hour. Some witnesses testified that under these circumstances the fetal heartbeat should have been monitored every five minutes.

In addition, the attending nurse herself admitted that it was "common practice in Kaiser Hospital for the LPN in the obstetrics ward" to monitor the heart

tones of the patient "quite frequently." She also admitted that she was aware of the fact that the amniotic fluid was "stained" when the membrane was ruptured and that this could "be a problem for the baby."

There was also evidence that Mrs. Libbee's medical chart showed that monitoring had taken place at least every half-hour. This, of course, was contrary to the testimony of Mrs. Libbee that no one monitored the heartbeat for a period of one hour, from 12:30 to 1:30 a.m., despite the fact that at 1 a.m. she had "a different kind of a pain that would not subside" and rang a bell to summon a nurse, but that no nurse appeared until 1:30 a.m., at which time this unborn child was dead.

In our opinion, the jury could have reasonably inferred from this evidence that the purpose of the nurse in making the entry in Mrs. Libbee's medical chart showing that the fetal heartbeat had been monitored every half-hour during that interval, when such was not the fact, was to make it appear that the fetal heartbeat had in fact been monitored at least every half-hour, as had been done at all times prior to 1 a.m. The jury could also have inferred from these facts that the nurse would not have made such a false entry unless either (1) she knew very well that it was the customary, if not the required, nursing practice to monitor at least every half-hour under these circumstances, or (2) unless the doctor had given instructions to do so.

We hold that these were reasonable inferences which the jury could properly have drawn from the evidence in this case and that it was error for the trial court to refuse to submit the evidence to the jury so that it could have decided whether or not to do so.

We also hold that there was sufficient evidence to go to the jury on the issue of causation, despite defendants' contention to the contrary.

For all of these reasons, it was error for the trial court to grant the motion for a directed verdict in favor of defendant hospital.

Reversed and remanded.

O'CONNELL, C. J., dissenting.

The only specification of negligence made against the defendant hospital was the failure to timely monitor the fetal heart tones or to instruct hospital personnel to do so. The hospital's duty in this respect admittedly arose only because of the somewhat unusual circumstances of Mrs. Libbee's pregnancy. This being the case, the alleged conduct involved professional malpractice, not ordinary negligence, and required proof of the customary professional standard of care in such circumstances.[1]

The defendant could not be held liable unless the care provided in this case failed to conform to the standard of care provided by hospitals in the community.[2] There was evidence presented in this case that Mrs. Libbee's condition and medical history was such that it would have been customary medical practice to monitor the fetal heartbeat at least every half hour. As the majority points out, the jury could have disbelieved the hospital chart and accepted Mrs. Libbee's

[1] For this reason, those cases cited by the majority which hold that proof of professional standards is unnecessary where gross neglect or non-medical conduct is involved are inapposite. *See* e.g., Annotation: Necessity of expert evidence to support action against hospital for injury to or death of patient, 40 ALR3d 515 (1971).

[2] Wood v. Miller, 158 Or 444, 76 P2d 963 (1938).

testimony concerning the frequency of this monitoring and concluded that this practice was not followed in this case. But that evidence would be sufficient only to support a finding of malpractice on the part of the doctors; it is not enough to establish the negligence of nurse DeSylvia or her principal, The Permanente Clinic, unless it were further shown either that the nurse was directed by the attending physician to monitor with such frequency and she failed to do so, or that customary nursing procedure, in the absence of special instructions, would have been to do so.

The majority reasons that the jury could have inferred that the nurse would not have made a false entry in the record unless (1) she knew that it was customary nursing practice to monitor at least every half hour, or (2) that the doctor had given instructions to do so.

The second inference would not be permissible because plaintiff's own pleading and evidence are directly to the contrary. This leaves us with the inference that the nurse falsified the record because she knew that it was customary to monitor every one-half hour and she wanted to make it appear that she had complied with that customary practice.

In the first place it must be noted that there is no direct evidence in this case that the hospital record was falsified and absolutely no evidence that, assuming it was, it was falsified either by a nurse or by any other person qualified to establish the customary nursing practice. Yet, avoiding this problem, the majority finds it permissible to derive evidence of the customary practice from the fact that there were other entries on the record showing monitoring intervals of one-half

hour. It is difficult for me to see how the record of one particular instance can be extrapolated into a customary practice in the community. The fact that the nurses monitored the heartbeat at half-hour intervals in this particular case does not tell us what intervals the medical profession would deem necessary under the circumstances of this case.

If this reasoning is carried over into other cases charging negligent medical practice, the standard of conduct can hereafter be proved simply from defendant's showing what was done in the particular case rather than by the testimony of doctors explaining what is the customary medical practice. Indeed, from now on there will apparently be a jury question in malpractice cases whenever there is a dispute between the parties as to the facts of the case. Thus, what I had always thought to be the crucial issue in such cases—whether the care provided meets the standard prevailing in the community—has been rendered an irrelevant consideration.

The majority opinion, starting with the permissible inference that the record was falsified and building upon that, fashions an argument for liability which strikes me as ingenious. It certainly must not have occurred to counsel because the argument was never presented either in the briefs or in oral argument.

DENECKE and BRYSON, JJ., concur in this opinion.

ON PETITION FOR REHEARING

*William L. Hallmark,* Robert P. Jones, and Mc-

Menamin, Jones, Joseph & Lang, Portland, for the petition.

*Theodore S. Bloom* and Martindale, Ruben & Rothman, Portland, contra.

TONGUE, J.

Defendants have filed a petition for rehearing in which they contend that we erred "in holding that there was evidence from which the jury could find the hospital negligently caused the death of plaintiff's decedent."

Defendants contend that although the motive of the nurse in falsifying the hospital records to show that she monitored the heartbeat every one-half hour *"may* have been as suggested by the majority [i.e., that she knew that it was customary nursing practice to monitor every half-hour]," other inferences were also possible, such as (1) that she knew this not to be a "medical standard," but "simply as a personnel rule," or (2) that she wanted to cover up for a doctor, or (3) that the "gap in the medical records didn't look right."

In considering this question we must remember that in addition to the fact that the nurse made an entry in the hospital records showing that the fetal heartbeat was checked during the interval of over one hour, contrary to plaintiff's testimony that no such check was made, there was also the following additional testimony:

(1) There was medical testimony that under the circumstances presented by Mrs. Libbee's pregnancy it would have been customary medical practice to monitor the fetal heartbeat at least every half-hour and some witnesses testified that under these circumstances

the fetal heartbeat should have been monitored every five minutes.

(2) The hospital records showed a pattern of checking the fetal heartbeat of this child approximately every half-hour prior to the period of over one hour during which, according to plaintiff, no such check was made.

(3) This nurse was a trained and experienced obstetrical nurse.

(4) The nurse admitted that she was aware of the fact that the amniotic fluid was "stained" when the membrane was ruptured and that this could "be a problem for the baby."

(5) The nurse also admitted that it was "common practice in Kaiser Hospital for an LPN [Licensed Practical Nurse] to monitor the heart tones of the patient 'quite frequently.'"

■ Considering this evidence, together with the evidence that the nurse made an entry in the hospital record from which it was made to appear that she continued her previous practice of checking the fetal heartbeat of the child every one-half hour during the interval of over one hour, despite plaintiff's testimony that no such check was made during that interval, the jury could have properly found, in our opinion, that the nurse made that entry because she realized that good nursing practice by a trained obstetrical nurse required the monitor of fetal heart of such a child *at least* every half-hour under circumstances presented by Mrs. Libbee's pregnancy, particularly when this trained obstetrical nurse not only admitted knowing that the nursing practice at that hospital was that fetal heartbeats should be monitored "quite fre-

quently," but also knew that there was a "problem" for this particular baby, and that this was the most likely explanation for the conduct of this trained and experienced obstetrical nurse.

To suggest that it was just as likely that such a nurse would falsify a record to "cover up for a doctor," or to "fill a gap" in the record, or because of a "personnel rule" is simply not realistic, in our opinion. In other words, the existence of those other *possible* inferences does not provide a defense in this case any more than the possible inferences which were rejected by this court in *Cowgill, Adm'r v. Boock, Adm'r*, 189 Or 282, 292, 218 P2d 445 (1950).

Defendants also contend, on the issue of causation, that "the cause of death was medical mismanagement of the doctors in failing to perform a Caesarean" some three hours earlier. At the time of trial, however, the doctors contended that they were not negligent in not taking the child sooner and the jury apparently agreed by its verdict in favor of the doctors.

Defendants' petition also refers to testimony by the doctors that "the odds of the baby being born alive at the end of a 40-minute delay were incredibly low" and that "10 minutes was the outside limit on the ability of the child to survive without oxygen," with the result that "it would be speculative to conclude that the child's life would have been saved." That testimony, however, did not go directly to the question of how long the baby would have survived if the heartbeat had been properly monitored and if proper steps had been taken promptly after the fetal heartbeat stopped.

■ The question to be decided in this case on the issue of causation is whether, assuming that it was proper to allow the mother's labor to continue for a

natural childbirth, subject to monitoring by the nurse, the jury could properly find that the failure to monitor the child for a period of more than one hour, and after the mother had felt a sudden pain and called for a nurse, was a "substantial factor" in causing the death of a child that was described by some testimony as a "beautiful, perfect, normal baby."

It may be that the failure to monitor this baby during that period of over one hour was not the *sole* cause of its death. It is our opinion, however, that this was a question of fact for the jury and that under the record in this case the jury could properly find that this was a "substantial factor" in bringing about the death of this child. Cf. *Babler Bros. v. Pac. Intermountain,* 244 Or 459, 464, 415 P2d 735 (1966).

Defendants' petition also requests that we expressly state that the judgment of the trial court in favor of all defendants other than defendant hospital is affirmed. We so hold. The only errors assigned on appeal related to the negligence of defendant hospital.[1]

Defendants next ask that to avoid possible misunderstanding whether the measure of damages in this case, as an action for wrongful death, is controlled by ORS 30.020 prior to amendment by Oregon Laws 1973, ch 718, we set forth the provision of Section 7 of that Act. That section provides as follows:

"This act takes effect January 1, 1974, and applies to decedents dying on or after January 1, 1974."

The petition for rehearing is denied.

---

[1] Defendants also call our attention to an inadvertent error in footnote 1 of our opinion. In the preparation of the final draft we overlooked a correction of that footnote to read: "The jury returned a verdict in favor of the defendant doctors and clinic," in accordance with our understanding at that time of the record of this case.