Betty J. NELSON, Plaintiff and Appellant,

v.

Perry A. PETERSON, M.D., and Valley West
Hospital Development Corporation, A Utah
corporation, dba Valley West Hospital, De-
fendants and Respondents.

No. 13803.

Supreme Court of Utah.

Nov. 26, 1975.

W. Eugene Hansen and G. Richard Hill
of Hansen & Orton, Raymond A. Hintze
of Walker, Hintze & Anderson, Inc., Salt
Lake City, for plaintiff and appellant.

John H. Snow of Worsley, Snow & Christensen, Salt Lake City, for Perry Peterson.

Ray R. Christensen of Christensen, Gardiner, Jensen & Evans, Salt Lake City, for Valley West Hospital.

ELLETT, Justice:

This is an appeal from an adverse judgment based in an action for the wrongful death of a full-term fetus together with damages for the pain and suffering allegedly caused by the negligent care of plaintiff in connection with the delivery of her stillborn baby. She assigns three grounds of error, viz.:

1. The verdict was against the manifest weight of the evidence.

2. The court erred in allowing testimony concerning the child's father and the plaintiff's status as a welfare recipient.

3. The court refused to permit recovery for the wrongful death of a full-term viable fetus.

The jury had before it the following evidence which was credible:

The plaintiff went to the hospital with false labor pains on August 28 and was discharged after the defendant doctor examined her. She was examined by the doctor on September 2 in his office, and at that time the membrane was thin, but the water had not broken. The doctor ordered her to go to the hospital so that labor could be induced. She went to the hospital and was examined externally by a nurse who detected the heartbeat of the fetus. The nurse caused her to wear a hospital gown and put her to bed. Because of a complicated delivery in the obstetrics room, plaintiff was left in bed with her sister in attendance. She had no labor pains, and she made no call for assistance although there was a call button for her convenience. After approximately two hours the other delivery was completed and the delivery room made ready for service. The nurses then undertook to induce labor for the appellant but experienced some difficulty in getting the equipment to function properly. Just as the machine was ready for service, the defendant doctor arrived at the hospital and made' an examination of the plaintiff and discovered that the umbilical cord was protruding from the vagina. He was not able to detect any fetal heartbeats and attempted to relieve the pressure on the cord but was not able to restore life to the fetus. The nurses had not made a vaginal examination prior to the arrival of the doctor. Labor was induced, and the dead fetus was thereafter delivered.

As to the first assignment of error, there was evidence that some hospitals in the vicinity require a vaginal examination by a nurse upon arrival of a pregnant patient for delivery of the child. The evidence does not clearly preponderate that the requirement is in general use in this area, and this is especially true in this case where the patient was examined by the doctor immediately before she entered the hospital. Whether the failure to so examine by the nurses would be negligence would also be determined in the light of all the surrounding circumstances. The patient in this case had come immediately from the doctor's office. She made no statement that her water had broken during the trip. There was nothing to indicate that it had. She was not in labor. The nurses were busy with a complicated emergency delivery at the time. Whether the nurses should have ceased their work with the emergency case and examined the appellant internally was a factual question which the jury was required to decide. We do not change the findings of a jury where there is competent evidence to sustain them, and in this case we cannot say that the actions of the doctor and the lack of action of the nurses were so clearly negligent that we should reverse the judgment which was based on the jury verdict.

The appellant claims error because the court did not grant a mistrial after testimony was given by the defendant doctor while being cross-examined by the at-

torney for the hospital. The testimony concerned the doctor's record of the patient and was as follows:

Q. And I note it says "Name: Billie Jean Rex." Is that the name under which she came to you for treatment initially?

A. Yes, it is.

Q. Then, above it is written the name "Betty Nelson." When did you get the name of Betty Nelson?

A. The patient came to me first in the wintertime. The first I note of her name was different than Billie Jean Rex was in June at which time she had applied for welfare and was required to give her proper identification and at this time I learned that her name was Betty Nelson and we had an illegitimate pregnancy as well.

Because the pregnancy was due to an illegitimate relationship, the plaintiff apparently gave her maiden name so as to avoid embarrassment.

Although the court pursuant to a pretrial motion had ordered counsel not to mention illegitimacy and welfare, the doctor seemed to be trying to explain the reason why his medical chart showed that the original name was other than that of the plaintiff.

The court had originally thought that the two subjects had no relevancy to the case and so made the order above mentioned. In denying the motion for a new trial, the judge stated: "She is here claiming great mental anguish because of the loss of the child. I think the fact that it was an illegitimate child might very well have a bearing upon that very thing."

The appellant had seven other children, and her mental anguish might not be so acute at the loss of an illegitimate fetus as would be if she had no children and the one expected was legitimate. Many women undergo abortions in such a situation, and

the jury was entitled to know all the circumstances if they were to fairly appraise the quantum of mental anguish which appellant suffered. We do not think the court erred in refusing to grant a mistrial.

■ The third assignment of error is without merit and was decided to be so in the case of *Webb v. Snow*.[1] There the plaintiff, a married lady, was pregnant and suffered a miscarriage as a result of an assault and battery by the defendants. She sought damages for the wrongful death of her child and caused the trial court to instruct the jury to the effect that if she recovered, she would be entitled to "money damages for the loss of her unborn child as a result of said miscarriage." In setting aside the verdict for the plaintiff, this court stated:

. . . While injuries resulting in a miscarriage are actionable, and compensation may be awarded for the physical and mental sufferings experienced by a woman who has a miscarriage by reason of injuries caused by the wrongful acts of others, *damages are not awarded for "loss of the unborn child" itself*. . . . [Emphasis added.]

In the case now before us, the trial judge gave an instruction which contained the following: "[C]ompensation may be awarded for mental suffering experienced by a woman undergoing such an experience." The plaintiff cannot complain about the instruction, as it allowed recovery for her mental distress even though the death of the fetus was not caused by a battery or by wilful misconduct. The question of damages is moot since the jury found by general verdict for each defendant, which under the instructions of the court showed that neither defendant was negligent.

■ Certainly the death of a viable fetus should be considered as much a ground for damages as would a miscarriage. Whether

1. 102 Utah 435, 444, 132 P.2d 114, 119 (1942).

or not it gives a different basis for recovery can be determined when liability has been found in a proper case.

The judgment is affirmed. No costs are awarded.

HENRIOD, C. J., and CROCKETT, J., concur.

MAUGHAN, Justice (dissenting).

For the following reasons I dissent and would reverse for a new trial.

By a motion in limine plaintiff sought exclusion of evidence relating to:

1. Who is the father of the stillborn child.

2. Whether the plaintiff was or is on welfare.

3. The whereabouts of plaintiff's children who are not residing with her.

4. Whether or why plaintiff gave her maiden name to defendant doctor's nurse. The court granted the motion as to 1 and 2 and denied the same as to 3 and 4.

The record shows the defendant doctor was in court at the time this motion was made and heard the judge's instructions concerning the excluded testimony. Yet, in answer to a question about two names appearing on his office chart, the defendant doctor responded:

> The patient came to me first in the wintertime. The first I note of her name was different than Billie Jean Rex was in June at which time she had applied for welfare and was required to give her proper identification, and at this time I learned that her name was Betty Nelson and we had an illegitimate pregnancy as well.

At this juncture plaintiff moved for a mistrial, which was denied. After argument of counsel, the trial court changed its mind, overruling its previous order on the motion in limine, and said:

> She is here claiming great mental anguish because of the loss of the child.

I think the fact that it was an illegitimate child might very well have a bearing upon that very thing [damages]. Well, if I am wrong, I am wrong.

Later, counsel for one of the defendants directly questioned plaintiff:

> Mrs. Nelson, you do not know the name of the father of this child, do you?
>
> A. No, I do not.
>
> Q. It is a person you met by chance at a bar one evening?

Plaintiff moved to strike the affirmative answer. The motion was denied.

It is my view that this line of questioning is improper for two reasons, the first being that it is in direct contravention of the court's order on the motion in limine. The second, and more important, is that it is intrinsically highly prejudicial.

To hold as the trial court did, and this court does, that the sensibilities of a mother of a child born out of wedlock are not shocked as seriously as those of a mother whose child is born in wedlock is to indulge in a highly speculative generality, a generality of which there is no proof, a generality devoid of proof, but rich in stigma, which accounts for its prejudicial nature. Life, and the law books, are full of examples in contradiction of such a generality. Such evidence is of no more probative value than is that which showed plaintiff to be on welfare.

In Dillon v. Wallace,[1] the court addressed itself to similar extraneous evidence about the plaintiff's family situation which was admitted to show mental anguish. Citing two California Supreme Court decisions ruling on prejudicial evidence, the court cites from one of them.

> On strictly logical grounds it is, perhaps, difficult to say why a plaintiff should not be allowed to show every fact connected with his situation in life. One can conceive of innumerable factors in the life of every individual, and of his relation to others, which might be

1. 148 Cal.App.2d 447, 306 P.2d 1044 (1957).

thought to have some relevance to the extent of worry which would result in case of an injury to him. But logical relevancy is not the sole test of the admissibility of evidence. Certain kinds of evidence, although material to the issue, are excluded because of their tendency to mislead, confuse or prejudice the jury.

. . .

It is my view that such use of illegitimacy is also discriminatory.[2] The prejudicial quality of this evidence would color the consideration by the jury of all issues in this matter, including that of liability.

Plaintiff also assigns as error the refusal of the trial court to allow plaintiff to bring an action for the wrongful death of a full-term viable fetus. Here again it is my view that plaintiff's point is well made. Our case of *Webb v. Snow*[3] is not applicable for two reasons: First, the operative facts are completely distinguishable; and we would not do an injustice to stare decisis for the reason that the concept advanced by that case is no longer a part of the weight of authority in this country. Additionally, I see no moral, biological, or legal rationale for sustaining an outmoded, dry, rule laced with the fictions of a bygone era.

In the matter of Libbee v. Permanente Clinic[4] is found a situation very similar to the one at hand. The court rejected the view that an unborn child has no judicial existence apart from its mother and cites those cases representing the weight of authority in this country sustaining the court's opinion.

Plaintiff adduced substantial evidence upon which recovery could have been sustained had the jury believed her. She should have been given the opportunity to be believed without the prejudicial effect of the evidence alluded to above.

TUCKETT, J., concurs in the views expressed in the dissenting opinion of MAUGHAN, J.

2. 38 A.L.R.3d 613, Sec. 2; 118 U. of Pa.Law Rev. 1 (1969).

3. 102 Utah 435, 444, 132 P.2d 114 (1942).