**BONBREST et al. v. KOTZ et al.**
**Civ. A. No. 26607.**

District Court of the United States for the District of Columbia.

March 6, 1946.

H. Mason Welsh and Donald S. Caruthers, both of Washington, D. C., for plaintiffs.

Austin Canfield and William T. Hannan, both of Washington, D. C., for defendants.

McGUIRE, Justice.

The question raised by the motion is whether an infant through its father and next friend has a right of action springing from the alleged fact it was taken from its mother's womb through professional malpractice, with resultant consequences of a detrimental character.

 It is a novel one in this jurisdiction, and judicial opinion, in those where it has been met,[1] has held that at common law, in the absence of statute, prenatal injury affords no basis for an action in tort, in favor either of the child or its personal representative.

This conclusion is predicated, it appears, on the assumption that a child en ventre sa mere has no juridical existence, and is so intimately united with its mother as to be a "part" of her and as a consequence is not to be regarded as a separate, distinct, and individual entity.

This rather anomalous doctrine was announced by Mr. Justice Holmes in the leading case of Dietrich v. Inhabitants of Northampton,[2] which apparently has been relied upon as dispositive and controlling ever since,[3] except in those few cases where recovery was barred on the theory of no contract and, therefore, no duty.[4]

The Court, in the opinion referred to, disposes of the analogy drawn from the

[1] Drobner v. Peters, 232 N.Y. 220, 133 N.E. 567, 20 A.L.R. 1505; Magnolia Coca Cola Bottling Co. v. Jordan et ux. 124 Tex. 347, 78 S.W.2d 944, 97 A.L.R. 1513; 14 R.C.L. 218, par. 5.

[2] 1884, 138 Mass. 14, 52 Am.Rep. 242.

[3] Allaire v. St. Luke's Hospital, 1900, 184 Ill. 359, 56 N.E. 638, 48 L.R.A. 225, 75 Am.St.Rep. 176, strong dissent by Boggs, J.; Gorman v. Budlong, 1901, 23 R.I. 169, 49 A. 704, 55 L.R.A. 118, 91 Am. St.Rep. 629; Buel v. United Rys. Co., 1913, 248 Mo. 126, 154 S.W. 71, 45 L. R.A.,N.S., 625, Ann.Cas.1914C, 613; Lipps v. Milwaukee Elec. R. & L. Co., 1916, 164 Wis. 272, 159 N.W. 916, L. R.A.1917B, 334; Drobner v. Peters, 1921, 232 N.Y. 220, 133 N.E. 567, 20 A.L.R. 1503, Cardozo, J., dissenting— no opinion; Stanford v. St. Louis S. F. R. Co., 1926, 214 Ala. 618, 108 So. 566; Magnolia Coca Cola Bottling Co. v. Jordan, 1935, 124 Tex. 347, 78 S.W.2d 944, 97 A.L.R. 1513; Berlin v. J. C. Penney Co., 1940, 339 Pa. 547, 16 A.2d 28; Stemmer v. Kline, 1942, 128 N.J.L. 455, 26 A. 2d 489, 684, strong dissents by Brogan, C. J., et al. See also Birmingham Baptist Hospital v. Branton, 1929, 218 Ala. 464, 118 So. 741; Snow v. Allen, 1933, 227 Ala. 615, 151 So. 468.

[4] Nugent v. Brooklyn Hts. R. Co., 154 App.Div. 667, 139 N.Y.S. 367; Walker v. Great Nor. Ry. Co. of Ireland, 1890, Ir. L.R. 28 C.L. 69.

common law of property and crimes [5] and then adds significantly:

"Taking all the foregoing considerations into account, and further, that, as the unborn child was a part of the mother at the time of the injury, *any damage to it which was not too remote* (italics supplied) to be recovered for at all was recoverable by her. * * *" [6]

But on the assumed facts here we have not, as in the Dietrich case, "an injury transmitted from the actor to a person through his own organic substance, or through his mother, before he became a person" standing "on the same footing as an injury transmitted to an existing person through other intervening substances outside him, * * *" [7] but a direct injury to a *viable* [8] child—the distinction is an important one—by the defendants in their professional capacities.

This seems to me to be the solid factual ground on which the two cases stand distinguished.

It is further to be noted that the Court, [9] alluding to what it termed the difficulty of remoteness in predicating a right of action for injury transmitted to a person through what it calls "* * * other *intervening* (italics supplied) substances outside him," has this to say:

"If these general difficulties could be got over, and if we should assume, irrespective of precedent, that a man might owe a civil duty and incur a conditional prospective liability in tort to one not yet in being, and if we should assume also that causing an infant to be born prematurely stands on the same footing as wounding or poisoning, [10] we should then be confronted by the question raised by the defendant, whether an infant *dying before it was able to live separated from its mother* (italics supplied) could be said to have become a person recognized by the law as capable of having a locus standi in court * * *."

Here, however, we have a viable child—one capable of living outside the womb—and which has demonstrated its capacity to survive by *surviving*—are we to say *now* it has no locus standi in court or elsewhere?

As to a viable child being "part" of its mother—this argument seems to me to be a contradiction in terms. True, it is in the womb, but it is capable now of extra-uterine life—and while dependent for its continued development on sustenance derived from its peculiar relationship to its mother, it is not a "part" of the mother in the sense of a constituent element—as that term is generally understood. Modern medicine is replete with cases of living children being taken from dead mothers. Indeed, apart from viability, a non-viable foetus is not a part of its mother. [11]

From the viewpoint of the civil law and the law of property, a child en ventre sa mere is not only regarded as human being, but as such from the moment of conception—which it is in fact. [12]

Why a "part" of the mother under the law of negligence and a separate entity and person in that of property and crime? [13]

---

[5] 3 Inst. 50; Beale v. Beale, 1 P.Wms. 244, 246; Burdet v. Hopegood, 1 P.Wms. 486.

[6] Dietrich case, supra, 138 Mass. at page 17, 52 Am.Rep. 242.

[7] Dietrich case, supra, 138 Mass. at page 16, 52 Am.Rep. 242.

[8] It is to be noted that there is a medical distinction between the term "embryo" and a "viable foetus". The embryo is the foetus in its earliest stages of development, especially before the end of the third month, but the term "viable" means that the foetus has reached such a stage of development that it can live outside of the uterus. American Illustrated Medical Dictionary, 19th Ed., Dorland, pp. 483, 1605.

[9] Dietrich case, supra, 138 Mass. at page 16, 52 Am.Rep. 242.

[10] See footnote 5.

[11] "By the eighth week the embryo or foetus, as we now call it, is an unmistakable human being, even though it is still only three-quarters of an inch long. * * *" Ourselves Unborn, p. 69, Corner, Yale University Press, New Haven, 1944 (representing substance of the Terry Lectures at Yale in March, 1944). "Indeed, the Chinese have long recognized that when a man is born he is already nine months old. Each of their babies is given at birth a full year's credit on the reckoning of its age." Ibid., p. 1.
See also Physiology and Anatomy, Greisheimer, J. B. Lippincott & Co., 5th Ed., 1945, p. 738.

[12] Qui in utero sunt, in toto paene iure ciuili intelligentur in rerum natura esse. Digest of Justinian, lib. 1, tit. 5, s. 26. cf. also Rex v. Senior, 1 Mood.C.C. 346, 1 C. & M. 650; 1 Blackstone's Commentaries, 129, 130.

[13] The English word "person" derives from the Latin "persona", and originally

Why a human being, under the civil law, and a non-entity under the Common Law?

It has, if viable, its own bodily form and members, manifests all of the anatomical characteristics of individuality, possesses its own circulatory, vascular and excretory systems and is capable *now* of being ushered into the visible world.[14]

The Supreme Court of Canada, in permitting recovery in a case of this character—although the negligence alleged was in the operation of a tram—had this to say:[15]

"The wrongful act which constitutes the crime may constitute also a tort, and if the law recognizes the separate existence of the unborn child sufficiently to punish the crime, it is difficult to see why it should not also recognize its separate existence for the purpose of redressing the tort."[16]

Further it cogently—and more pertinently—observes:

"If a child *after birth* (italics supplied)[17] has no right of action for prenatal injuries, we have a wrong inflicted for which there is no remedy, for, although the father may be entitled to compensation for the loss he has incurred and the mother for what she has suffered, yet there is a residuum of injury for which compensation cannot be had save at the suit of the child. If a right of action be denied to the child it will be compelled, without any fault on its part, to go through life carrying the seal of another's fault and bearing a very heavy burden of infirmity and inconvenience without any com-

---

meant "mask." It's (1) a specific kind or manifestation of *individual* character; (2) a *being* characterized by *conscious apprehension, rationality* and a *moral* sense; a being *possessing* or *forming* the *subject* of personality, hence an *individual human being;* a *particular individual;* (3) (c) one as distinguished *emphatically* from *things* or *animals* (italics supplied). Webster's New International Dictionary, 2nd Ed.

Every human embryo is possessed of as effects within a cause of all of the sentient, vegetative and spiritual (the latter term used in opposition to the former) qualities of an adult, subject, of course, to the latter influence of environment and education. So while the state may pass a statute permitting therapeutic abortion, the individual human being thus disposed of, is no unjust aggressor. It is in the place designed for it by nature and the God of Nature, and the state here exercises a dominion over life, which is the prerogative of the Creator alone. The same prohibition would apply if the state should pass a law permitting euthanasia. Not to be confused, however, with the right to take the life of a criminal (unjust aggressor), or that inherent in it by virtue of its sovereignty in a lawful and just war.

"The fertilized human ovum is a one-celled *individual* (italics supplied). * * * It is called a zygote. In this zygote are contained all the potentialities of the new individual who is to develop from it." Physiology and Anatomy, supra, p. 738.

Could it be argued that the famous Siamese twins, Chang and Eng, were such a part of each other that they could not be recognized as two, separate, distinct, individual entities or persons? They were joined to each other in much the same fashion as the child is joined to its mother—with this very important exception, that they were inseparable; that is, separation could not be achieved without immediate death. In a *viable* child that is *not* the situation. Chang and Eng died in North Carolina on January 17, 1874; Chang from a cerebral hemmorrhage and Eng, *several hours later,* from fright; at the age of sixty years, each having reared his own separate family of normal offspring. American Journal of Medical Science, Vol. 67, p. 572; Anomalies and Curiosities of Medicine, Gould and Pyle, 1897, p. 171.

[14] Elements of Medical Jurisprudence, Beck, 10th Ed., Vol. 1, p. 227. "During fetal life, the pathway of the blood returning from the placenta is via the umbilical vein." Human Embryology, Krafka, 1942, Harper & Bros., New York, p. 161; "The placenta is the afterbirth extruded about fifteen minutes after the birth of the child * * * and has a double origin fetal and maternal." ibid, p. 106.

[15] Montreal Tramways v. Leveille, 1933, 4 Dom.L.R. 337. In this case a woman seven months pregnant was descending from a tram, when, as a result of the negligence of the operator, she was thrown, or fell to the street. Two months later she gave birth to a child with club feet. The company defended on the ground (1) a child en ventre sa mere is not an existing person in rerum natura, but *only a part of its mother* (italics supplied); (2) the company's liability was founded on contract express or implied and there had been no contract with the child. Citing Walker v. Great Nor. Ry. of Ireland, supra. See also: 22 B.U.L.R., 1942, p. 621 et seq.; 26 H.L.R., 1912–13, p. 638.

[16] Ibid., p. 344.

[17] Emphasizing "viability".

pensation therefor. To my mind it is but natural justice that a child, if born alive and *viable* (italics supplied) should be allowed to maintain an action in the courts for injuries wrongfully committed upon its person while in the womb of its mother." [18]

The logic of this position, it seems to me, is unassailable.

But Mr. Justice Holmes has said "the life of the law has been *not logic:* it has been *experience*" [19] (italics supplied) and here we find a willingness to face the facts of life rather than a myopic and specious resort to precedent to avoid attachment of responsibility where it ought to *attach* [20] and to permit idiocy, imbecility, paralysis, loss of function, and like residuals of another's negligence to be locked in the limbo of uncompensable wrong, because of a legal fiction, long outmoded. [21]

■ The common law is not an arid and sterile thing, and it is anything but static and inert.

Indeed as Chief Justice Stone has so well said: [22]

"If, with discerning eye, we see differences as well as resemblances in the facts and experiences of the present when compared with those recorded in the precedents, we take the decisive step toward the achievement of a progressive science of law. If our appraisals are mechanical and superficial, the law which they generate will likewise be mechanical and superficial, to become at last but a dry and sterile formalism.

"It is just here, within the limited area where the judge has freedom of choice of the rule which he is to adopt, and in his comparison of the experiences of the past with those of the present, that occurs the most critical and delicate operation in the process of judicial lawmaking. Strictly speaking, he is often engaged not so much in extracting a rule of law from the precedents, as we were once accustomed to believe, as in making an appraisal and comparison of social values, the result of which may be decisive weight in determining what rule he is to apply. * * * The skill, resourcefulness and insight with which judges and lawyers weigh competing demands of social advantage, not unmindful that continuity and symmetry of the law are themselves such advantages, and with which they make choice among them in determining whether precedents shall be extended or restricted, chiefly give the measure of the vitality of the common-law system and its capacity for growth."

■ The absence of precedent should afford no refuge to those who by their wrongful act, if such be proved, have invaded the right of an individual—employed as the defendants were in this case to attend, in their professional capacities, both the mother and child. And what right is more inherent, and more sacrosanct, than that of the individual in his possession and enjoyment of his life, his limbs and his body?

In the recent case of Daily v. Parker, [23] in which no precedent could be found to recognize a cause of action by children against a woman who caused their father to leave them, the Court had this to say, in holding against the proposition that there is no remedy because there is no precedent:

"* * * the common law has been and is sufficiently elastic to meet changing conditions. We quote from Dean Pound's book, 'The Spirit of the Common Law,' p. 183:

"'Anglo-American law is fortunate indeed in entering upon a new period of growth with a well-established doctrine of law-making by judicial decision. * * * Undoubtedly * * * judicial empiricism was proceeding over-cautiously at the end of the last century. * * * If the last century insisted over-much upon predetermined premises, and a fixed technique, it did not lose to our law the method of applying the judicial experience of the past to the judicial questions of the present.'"

■ That a right of action in cases of this character would lead to others brought in bad faith and might present insuperable

---

[18] Ibid., p. 345.

[19] The Common Law, 1938, Little, Brown & Co., Lecture 1, p. 1.

[20] Cf. also Restatement of Law of Torts, Vol. 4, Sec. 869, where by caveat is stated: "The institute takes no position upon the question whether there is liability to a child hurt while unborn by a person who intentionally and recklessly and without excuse harms the mother or child." *Why this distinction?* See also: 22 B.U.L.R. 621.

[21] President & Directors of Georgtown College v. Hughes, 76 U.S.App.D.C. 123, 130 F.2d 810.

[22] Common Law and the United States, Stone, 50 H.L.R. 1936-7, p. 4, 5, 6, 7.

[23] 7 Cir., 1945, 152 F.2d 174, 176.

difficulties of proof—a premise with which I do not agree—is no argument. The law is presumed to keep pace with the sciences and medical science certainly has made progress since 1884. We are concerned here only with the right and not its implementation.

The motion for summary judgment is denied and counsel will prepare proper order.