John A. Monteleone, J.
In this action to recover damages for medical malpractice surrounding the pregnancy and delivery of plaintiff, Anabel Shack, defendant doctor, Jesse Holland, moves for partial summary judgment as to the second and third causes of action alleged in the complaint and for a severance of the remaining action on the grounds that the second cause of action on behalf of plaintiff’s son, Neil Shack, (lack of informed consent), fails to state a cause of action known to common law and that the third cause of action (by *79 Anabel Shack for loss of services and medical expenses) is barred by the Statute of Limitations.
Defendant Holland also moves for an order precluding plaintiffs, upon the trial of this action, from giving or offering any evidence of particulars demanded, and/or, in the alternative, directing the service of a further bill of particulars.
Plaintiffs cross-move for an order for various relief, authorizing the placing of this case on the calendar without delay; ordering all parties to appear for examination before trial; directing defendants to advise plaintiffs of the limits of their policy insurance; directing that all pretrial proceedings be completed within 30 days, and that the matter be placed at the top of the malpractice panel, and placing this case on the calendar for a day certain for trial.
The controversy herein arose 22 years ago in January, 1954. At that time plaintiff, Anabel Shack, gave birth to a son, plaintiff, Neil Shack. Plaintiffs now claim that as a result of defendant’s negligent conduct at the time of birth and during pregnancy and the lack of informed consent, plaintiff, Neil Shack, was born permanently maimed and deformed to his detriment and damage.
There are serious questions of law involved with respect to the defendant’s attack with regard to the second cause of action for lack of informed consent. The resolution of the legal issues presented in that cause of action has legal and sociological significance.
Simply stated, the issues presented are whether a conditional prospective liability to a fetus is created when an unborn child’s mother is not sufficiently informed of the risks, hazards and alternatives of the delivery procedure administered, and whether such liability attaches upon the birth of the child and inures to the benefit of the child in the nature of a cause of action for the lack of informed consent.
It is patently obvious from the issues framed that the problems posed are unique, challenging and complex.
To arrive at a proper determination it will be necessary to evaluate the historical development of the law of the rights of unborn infants and the evolution of the doctrine of informed consent. In both areas there has been a recent resolutionary surge and interest. A case study discloses a discernible trend in favor of granting a cause of action on behalf of the unborn child. Thus it has been stated that the prenatal infant should have his day in court; that he is entitled to recognition as a *80 "person” and to be given a chance to prove his case (36 Va L Rev 611, 624).
The rights of an unborn infant had its genesis in the early landmark case of Dietrich v Inhabitants of Northampton (138 Mass 14 [1884]), which was the first legal expression on the subject by any Anglo-American court. The Massachusetts’ court, speaking through Justice Holmes, denied recovery on the dual grounds that there was a lack of authority for permitting such an action and on the further ground that an unborn child is part of its mother, and, therefore has no distinct juridical existence and does not become a separate entity until birth. This attitude prevailed in the early cases following the Dietrich rule (supra) with slight variations (see Magnolia Coca Cola Bottling Co. v Jordan, 124 Tex 347; Berlin v Penney Co., 339 Pa 547; Stemmer v Kline, 128 NJL 455).
New York followed the lead of the Massachusetts case in Drobner v Peters (232 NY 220), where the Court of Appeals held that a complaint alleging prenatal injuries, tortiously inflicted on a nine-month-old fetus, viable at the time and born alive, was insufficient as a matter of law.
During this early period, although courts were nearly unanimous in rejecting a right of action for prenatal injuries, there were signs of a coming change of attitude. In the celebrated dissent in Allaire v St. Luke’s Hosp. (184 111 359) Justice Boggs argued for recognition of a common-law right of action for injuries to a viable unborn child which is later born alive. He maintained that if the fetus has reached the viable stage, the law should take cognizance of the fact that the injury was incurred by a distinct human entity.
Finally, in 1946, a United States District Court squarely held that injuries to a viable unborn child are compensable in a tort action brought by the child after its birth (Bonbrest v Kotz, 65 F Supp 138, 142 [1946]). The court in that case offered the following language: "The absence of precedent should afford no refuge to those who by their wrongful act, if such be proved, have invaded the right of an individual * * * The common law is not an arid and sterile thing and is anything but static and inert * * * The law is presumed to keep pace with the sciences and medical science certainly has made progress * * * We are concerned here only with the right and not its implementation.”
Thus a trend was in the making which would culminate in a complete rejection of the earlier restrictive view.
*81 In New York, Woods v Lancet (303 NY 349) overruled Drobner v Peters (supra) and held that a child may recover for prenatal injuries. The court went on to state that negligence law is common law and that common law has been molded and changed and brought up to date in many another case. In fact, a court has not only the right, but the duty, to reexamine a question where justice demands it. In that case the court argued that the change proposed in regard to the rights of prenatal injuries should come from the Legislature, not the courts. However, the court would be abdicating its own functions if it refused to consider an old and unsatisfactory court-made rule. That the supposed difficulty of proving or disproving the injuries that might befall an unborn child, or that they produced the defects discovered at birth or later, was also rejected as a reason for denying the cause of action, on the grounds that such difficulty of proof is not special to this particular kind of lawsuit; that it is beside the point in determining the sufficiency of a pleading, and that it is an inadmissible concept that uncertainty of proof can, in fact, destroy a legal right. "The questions of causation, reasonable certainty, etc., which will arise in these cases,” said the court (p 356), "are no different, in kind, from the ones that have arisen in thousands of other negligence cases * * * in the past.” The court finally held that as to the purely theoretical objection that a fetus in the womb of the mother has no existence of its own separate from that of the mother according to the allegation of the complaint, the (p 357) "injury occurred during the ninth month of the mother’s pregnancy * * * to a viable foetus, later born.”
Although acknowledging that a child still in the womb is, in one sense, a part of its mother, the court said (p 357): "no one seems to claim that the mother, in her own name and for herself, can get damages for the injuries to her infant. To hold, as a matter of law, that no viable foetus has any separate existence which the law will recognize is for the law to deny a simple and easily demonstrable fact.” The court continued: "This child, when injured, was in fact, alive and capable of being delivered and of remaining alive, separate from its mother * * * 'To deny the infant relief in this case is not only a harsh result, but its effect is to do reverence to an outmoded, time-worn fiction not founded on fact and within common knowledge untrue and unjustified.’ ”
This case was followed by Kelly v Gregory (282 App Div 542 *82 [1953]), which extended the ruling in the Woods case (303 NY 349, supra). Rejecting the viability requirement in cases of prenatal torts to a surviving child, the court said (p 545): "If the child born after an injury sustained at any period of his prenatal life can prove the effect on him of the tort * * * he makes out a right to recover”. Stating that the underlying problem troubling the Judges who had written on the subject of recovery for prenatal injuries was usually in fixing the point of legal separability from the mother, the court said (p 543-544): "that legal separability should begin where there is biological separability. We know something more of the actual process of conception and foetal development now than when some of the common-law cases were decided * * * [it was] impossible to demonstrate clearly that separability begins at conception.
"The mother’s biological contribution from conception on is nourishment and protection; but the foetus has become a separate organism and remains so throughout its life. That it may not live if its protection and nourishment are cut off earlier than the viable stage of its development is not to destroy its separability; it is rather to describe conditions under which life will not continue.”
The law has come full circle in granting a surviving infant a cause of action for prenatal injuries. Where the court previously spoke of the "unborn child,” today it speaks of the "unborn plaintiff.”
Having concluded that the unborn plaintiff may maintain an action for prenatal injuries, the question remains whether that right may be extended to include an action for lack of informed consent.
There has been a significant but uneven movement in the law of informed consent in medical malpractice actions.
Early malpractice decisions relied upon the assault and battery concept to impose liability upon physicians for the performance of unauthorized nonemergency procedures, despite the presence of due care, a beneficial result, no wrongful intent and a consensual relationship between the parties. The imposition of such liability was premised on a policy that a patient has a lawful right to know the nature of the touching to which he is submitting (see Plante, An Analysis of "Informed Consent”, 36 Fordham L Rev 639, 658). This policy found judicial expression in New York as early as 1914 in the case of Schloendorff v Society of N. Y. Hosp. (211 NY 125, 129- *83 130), and has had a significant impact upon the subsequent development of the doctrine of informed consent. In that case, Judge Cardozo stated: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient’s consent, commits an assault, for which he is liable in damages.”
Given the historic significance Anglo-American society places on the inviability of the human body, it is easy to understand why assault and battery principles were assimilated into the law of physician-patient relationships when no other adequate theory of recovery then existed; the protected interests would be jeopardized if the individual’s absolute right to be free from unwanted procedures on his body were made to depend on the subjective intentions or motivations of the physician. The failure comprehensively to inform the patient of the risks and implications of surgery was treated as vitiating the consent and resulting in liability for battery (54 Neb L Rev 66, 68). Courts, in a majority of jurisdictions, used this analysis for approximately the last 50 years.
However, apart from the difficulty in applying the "technical assault and battery” concept to medical malpractice cases, because the unauthorized touching, within the concept of medical care, lacked the traditional elements of wrongful intent and harmful aggression, battery law additionally failed to encompass all potential consent cases. A different basis of liability was needed where a medical procedure performed with the patient’s consent resulted in foreseeable harm undisclosed to the patient at the time consent was obtained.
Battery law, on the other hand, comprehended the nondisclosure of unavoidable consequences of treatment, not for failure to disclose only a possible risk of treatment (Prosser Torts [4th ed] § 18, p 106).
There is also a growing recognition that full disclosure could, in some cases, be injurious to either the physical or psychological well-being of the patient; thus, disclosure came to be perceived as a matter of professional judgment, to be measured against applicable medical standards (Prosser Torts [4th ed] § 32, p 165).
Moreover, in an informed consent situation, most jurisdictions permit a doctor to interpose a defense that the disclosure he omitted to make was not required within his medical community. However, expert opinion as to such standards is *84 not required in a battery count, in which the patient must merely prove failure to give informed consent and a mere touching, absent consent. Furthermore, a doctor could be held liable for punitive damages under a battery action.
Additionally, there is a difference in the period of the Statute of Limitations between an action in battery and one in negligence, with the patient usually having a longer Statute of Limitations if he sues in negligence.
These factors supported the transition in the early 1960’s away from battery theories and towards negligence law for failure to obtain consent without full disclosure of all known risks.
The re-examination of battery as the appropriate theory for an action under the doctrine of informed consent began in 1957 with the decision in Salgo v Leland Stanford Jr. Univ. (154 Cal App 2d 560) in which the court describes not only the duty to disclose facts necessary for an informed consent, but also the potential hazards of full disclosure. Thus the court held (p 578): "A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment * * * At the same time, the physician must place the welfare of his patient above all else * * * the patient’s mental and emotional condition is important and in certain cases may be crucial, and * * * in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent”. (Emphasis supplied.)
A subsequent Kansas case, Natanson v Kline (186 Kan 393, 409, reh den 187 Kan 186), expanded the specific Salgo premises: "This rule [in Salgo] in effect compels disclosure by the physician in order to assure that an informed consent of the patient is obtained. The duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances.”
Thus, Natanson clearly transferred the consent issue from battery into negligence law by providing a standard of professional conduct for measuring the sufficiency of disclosure. The court renamed the action "a claim of unauthorized treatment” and distinguished it from assault and battery and established in effect the prevailing view of the action today (see, Medical Malpractice in New York, 27 Syracuse L Rev 657, 731).
*85 Dean Prosser surveyed the decisions in this area and concluded, "The earliest cases treated this as a matter of vitiating the consent so that there was liability for battery * * * However, it began to be recognized that this was really a matter of the standard of professional conduct * * * The prevailing view now is that the action * * * is in reality one for negligence in failing to conform to the proper standards” (Prosser, Torts [4th ed] § 32, pp 165-166; for a different view, see, Plante, An Analysis of "Informed Consent”, 36 Fordham L Rev 639, supra).
New York has opted for the negligence approach under the recent statutory enactment. Thus, section 2805-d of the Public Health Law entitled "Limitation of medical malpractice action based on lack of informed consent”, states: "1. Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.”
Having concluded that the unborn plaintiff has a cause of action and that the duty to disclose the reasonable foreseeable risks involved is grounded in negligence, the immediate question is whether this plaintiff has a cause of action against this defendant for lack of informed consent to the mother of the child here involved.
The court is convinced that the second cause of action on behalf of plaintiff, Neil Shack, states a good cause of action. The court finds that although the obligation to disclose runs to the mother, plaintiff, Neil Shack, then unborn but within his mother’s womb, comes within the area of persons to be protected. The lack of informed consent of the mother would have its effect upon the fetus to be born for good or ill. A child in its mother’s womb is a foreseeable circumstance. Conduct, which creates a risk of harm to a woman, includes also a risk of harm to her unborn child. The standard of care imposed upon the doctor by the statute inures to the benefit of her unborn child. This is a classic example of derivative liability whereby a plaintiff may institute an action to redress a wrong done to himself which is proximately caused by a wrong done to another.
*86 Plaintiff, Neil Shack, states a good cause of action in informed consent.
The third cause of action on behalf of plaintiff, Anabel Shack, which seeks to recover damages for loss of services and medical expenses incurred is barred by the applicable Statute of Limitations (three years); her action is derivative. The papers and documentary proof submitted clearly show that the mother’s claim was not brought within three years from accrual. Moreover, the mother’s action, being derivative, cannot be tolled along with the infant’s claim from which it arose. The exception given the infant under the statute does not inure to the parent’s cause of action for loss of services and medical expenses (Bernal v Baptist Fresh Air Home Soc., 275 App Div 88, affd 300 NY 486).
Defendants’ demand to preclude plaintiffs for an inadequate bill of particulars, or, in the alternative, for a future bill of particulars is denied.
Though not artfully drawn, plaintiffs’ bill of particulars is responsive and sufficiently amplifies plaintiffs’ pleadings so that defendants may properly meet the issues raised.
In addition thereto, contrary to defendants’ assertions, plaintiffs may plead inconsistent causes of action.
Plaintiffs’ cross motion for the various relief indicated therein is denied in all respects. The myriad relief requested by the plaintiffs, which in essence seeks exceptional treatment with regard to placing the matter on the trial calendar and bringing the same to immediate trial, does not meet with the statutory requirement and rules; nor do the papers submitted and the facts alleged indicate that the matter should be given any exceptional treatment in this regard at this time.
It should be noted here that item "C” of plaintiffs’ demand has been fulfilled by defendants.
Accordingly, defendants’ motion to dismiss the second cause of action is denied; granted with respect to the dismissal of the third cause of action; denied with respect to defendants’ motion for a further bill or to preclude plaintiffs.
Plaintiffs’ cross motion is likewise denied in all respects.