Hallie A. MILTON et al.

v.

CARY MEDICAL CENTER et al.

Supreme Judicial Court of Maine.

Argued Sept. 8, 1987.
Decided Feb. 22, 1988.

Ricky L. Brunette (orally), Portland, for plaintiffs.

Arlyn H. Weeks (orally), Preti, Flaherty, Beliveau & Pachios, Portland, for Cary Medical Center.

Paul F. Macri (orally), Berman, Simmons & Goldberg, P.A., Lewiston, for Mazerolle.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

GLASSMAN, Justice.

Hallie A. and Michael Milton, individually, and Hallie A. Milton as the personal representative of the estate of baby girl Milton, appeal from the summary judgment entered by the Superior Court, Cumberland County, for the defendants, Cary Medical Center and Denis R. Mazerolle, on the Miltons' complaint. Essentially, the complaint alleged that the hospital and physician negligently cared for Hallie Milton during the latter part of her pregnancy and either caused or failed to prevent the death of her then unborn child.[1] We affirm the judgment as to the wrongful death claim of Hallie Milton, in her representative capacity, and the individual claims of the plaintiffs for loss of filial consortium, and vacate the judgment as to the remaining claims of the plaintiffs.

I

By a multi-count complaint, the Miltons jointly sought damages from the defendants for their mental and emotional distress, loss of filial consortium of their child, and the further medical care of Hallie Milton, all as the result of the alleged negligent medical care by the defendants of Hallie Milton during her pregnancy. In addition, Michael Milton sought damages for the loss of consortium of Hallie Milton, and Hallie Milton, as the personal representative of the estate of baby girl Milton, sought damages for the wrongful death of the child.

After hearing, the trial court granted the defendants' motion for summary judgment on all counts of the complaint, and the plaintiffs appeal.

II

Hallie Milton, in her representative capacity, contends that the trial court erred in its determination that a viable fetus is

1. The Miltons' notice of claim refers to Hallie Milton's pregnancy as being near term. For purposes of this opinion we assume the fetus had developed sufficiently to live outside the mother's womb and was, therefore, viable at the time of the defendants' alleged negligence. *See* 22 M.R.S.A. § 1598(2)(B) (1980), P.L.1979, ch. 405 ("'Viability' means the state of fetal development when the life of the fetus may be continued indefinitely outside the womb by natural or artificial life-supportive systems").

not a person for the purposes of 18–A M.R.S.A. § 2–804 (1981) and accordingly that a wrongful death action cannot be maintained for the death of a viable fetus.[2] This difficult question of whether a viable fetus is a person within the meaning of the wrongful death statute has not previously been addressed by this court. The separate personhood of a viable fetus was first recognized in *Bonbrest v. Katz*, 65 F.Supp. 138 (D.D.C.1946), when that court ruled that an action could be maintained by a living child for injuries sustained by that child as a viable fetus. Within three years the Minnesota Supreme Court upheld a wrongful death action for fatal prenatal injuries inflicted on a viable fetus. *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W. 2d 838 (1949).

The subject has now been extensively litigated in other jurisdictions with the courts in a majority of those states allowing a wrongful death action to be brought on behalf of a fatally injured viable fetus.[3]

**2.** At common law, an action for injuries resulting in death could not be maintained. Because the tort died with the injured person, "it was more profitable for the defendant to kill the plaintiff than to scratch him." Prosser, *Torts* 902 (4th ed. 1971). In order to correct this anomalous defect in the law, all American states enacted a wrongful death statute. In its current form the Maine statute provides in pertinent part:

> (a) Whenever the death of a *person* shall be caused by a wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then the person or the corporation that would have been liable if death had not ensued shall be liable for damages as provided in this section, notwithstanding the death of the person injured and although the death shall have been caused under such circumstances as shall amount to a felony.
>
> (b) Every such action shall be brought by and in the name of the personal representative of the deceased person, and the amount recovered in every such action, except as otherwise provided, shall be for the exclusive benefit of the surviving spouse, if no minor children, and of the children if no surviving spouse, and one-half for the exclusive benefit of the surviving spouse and one-half for the exclusive benefit of the minor children to be divided equally among them, if there are both surviving spouse and minor children, and to the deceased's heirs to be distributed as provided in section 2–106, if there is neither surviving spouse nor minor children. The jury may give such damages as it shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death to the persons for whose benefit the action is brought, and in addition thereto shall give such damages as will compensate the estate of the deceased person for reasonable expenses of medical, surgical and hospital care and treatment and for reasonable funeral expenses, and in addition thereto may give damages not exceeding $50,000 for the loss of comfort, society and companionship of the deceased to the persons for whose benefit

the action is brought, provided that the action shall be commenced within 2 years after the decedent's death. If a claim under this section is settled without an action having been commenced, the amount paid in settlement shall be distributed as provided in this subsection. No settlement on behalf of minor children shall be valid unless approved by the court, as provided in Title 14, section 1605. 18–A M.R.S.A. § 2–804 (1981 & Supp.1987) (emphasis added).

**3.** *See Eich v. Town of Gulf Shores*, 293 Ala. 95, 300 So.2d 354 (1974); *Summerfield v. Superior Court of Maricopa County*, 144 Ariz. 467, 698 P.2d 712 (1985); *Hatala v. Markiewica*, 26 Conn. Sup. 358, 224 A.2d 406 (1966); *Worgan v. Greggo and Ferrara, Inc.*, 50 Del. (11 Terry) 258, 128 A.2d 557 (1956); *Greater Southeast Community Hospital v. Williams*, 482 A.2d 394 (D.C.1984); *Porter v. Lassiter*, 91 Ga.App. 712, 87 S.E.2d 100 (1955); *Volk v. Baldazo*, 103 Idaho 570, 651 P.2d 11 (1982); *Chrisafogeorgis v. Brandenberg*, 55 Ill.2d 368, 304 N.E.2d 88 (1973); *Britt v. Sears*, 150 Ind.App. 487, 277 N.E.2d 20 (1971); *Dunn v. Rose Way, Inc.*, 333 N.W.2d 830 (Iowa 1983); *Hale v. Manion*, 189 Kan. 143, 368 P.2d 1 (1962); *Mitchell v. Couch*, 285 S.W.2d 901 (Ky.1955); *Danos v. St. Pierre*, 402 So.2d 633 (La.1981); *State ex rel. Odham v. Sherman*, 234 Md. 179, 198 A.2d 71 (1964); *Mone v. Greyhound Lines, Inc.*, 368 Mass. 354, 331 N.E.2d 916 (1975); *O'Neill v. Morse*, 385 Mich. 130, 188 N.W.2d 785 (1971); *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W.2d 838 (1949); *Rainey v. Horn*, 221 Miss. 269, 72 So.2d 434 (1954); *O'Grady v. Brown*, 654 S.W.2d 904 (Mo.1983); *White v. Yup*, 85 Nev. 527, 458 P.2d 617 (1969); *Poliquin v. MacDonald*, 101 N.H. 104, 135 A.2d 249 (1957); *Salazar v. St. Vincent Hospital*, 95 N.M. 150, 619 P.2d 826 (1980); *Hopkins v. McBane*, 359 N.W. 2d 862 (N.D.1984); *Stidam v. Ashmore*, 109 Ohio App. 431, 167 N.E.2d 106 (1959); *Evans v. Olson*, 550 P.2d 924 (Okla.1976); *Libbee v. Permanente Clinic*, 268 Or. 258, 518 P.2d 636 (1974); *Amadio v. Levin*, 509 Pa. 199, 501 A.2d 1085 (1985); *Presley v. Newport Hospital*, 117 R.I. 177, 365 A.2d 748 (1976); *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42 (1964); *Nelson v. Peterson*, 542 P.2d 1075 (Utah 1975); *Vail-*

In Tennessee and South Dakota the same result has been achieved by statute.[4] Courts in a lesser number of states, however, have refused to permit such an action.[5] In each case, the essential question has been whether a viable fetus is a "person." Although we are aware of these decisions of other jurisdictions, we conclude that rights under section 2–804 of the Probate Code are to be defined not by the reasoning of other courts but from a reading of our own law to derive its meaning and intent.

In our view, the meaning of subsection (a) must be controlled by our understanding of subsection (b).[6] We so held in relation to the predecessor sections, R.S. ch. 89, sections 9, 10 (1903). *Hammond v. Lewiston, Augusta and Waterville St. Ry.*, 106 Me. 209, 76 A. 672 (1909). In *Hammond* we stated that "both [sections] are to be construed together and as they create a liability unknown to the common law, their effect is to be limited to cases clearly within the terms of the act." *Id.* at 212–13, 76 A. 672. We then held that the nature of the remedy provided depends entirely on the rights vested in the beneficiaries "at the time of the decease." *Id.* at 213. Moreover, the act originally provided for damages based only on the "pecuniary injuries" to the beneficiaries. Thus, damages for the death of a minor child were severely limited. *See Picard v. Libby*, 152 Me. 257, 127 A.2d 490 (1956); *Dostie v. Lewiston Crushed Stone Co.*, 136 Me. 284, 8 A.2d 393 (1939); *Carrier v. Bornstein*, 136 Me. 1, 1 A.2d 219 (1938); *Curran v.*

*Lewiston, Augusta and Waterville St. Ry. Co.*, 112 Me. 96, 90 A. 973 (1914).

In the face of these judicial interpretations, the Legislature has not been silent. In 1967, the Legislature added non-pecuniary damages for the death of a child by inserting the following language:

> "and in addition thereto, where the deceased was a minor child at the time of the injury which resulted in death, damages not exceeding $5,000 may be recovered on behalf of the parents of said deceased minor for the loss of comfort, society and companionship of said minor"

P.L.1967, ch. 369 (P.L.1969, ch. 266 raised limit to $10,000). The terminology of this amendment is entirely inconsistent with the notion that a wrongful death action could be brought on behalf of a stillborn, viable fetus. The deceased must be *"a minor child at the time of the injury* which resulted in death," damages were to be recovered only on behalf of the parents, not heirs, and "for the *loss* of comfort, society and companionship of said minor." P.L. 1967, ch. 369 (emphasis added). These words utilized by the Legislature in 1967 influence our interpretation of the word "person" first utilized in the wrongful death statute in 1891. It is important to note that the language of the 1967 amendment was adopted 21 years after *Bonbrest v. Katz*, 65 F.Supp. 138 (D.D.C.1946), 18 years after *Verkennes v. Corniea*, 38 N.W. 2d 838 (1949), and after 11 other jurisdictions had allowed an action to be brought on behalf of a stillborn, viable fetus.

In 1977 the restriction on consortium claims to the loss of a minor child was

---

lancourt v. Medical Center Hospital of Vermont, 139 Vt. 138, 425 A.2d 92 (1980); Moen v. Hanson, 85 Wash.2d 597, 537 P.2d 266 (1975); Baldwin v. Butcher, 155 W.Va. 431, 184 S.E.2d 428 (1971); and Kwaterski v. State Farm Mutual Auto Insurance Co., 34 Wis.2d 14, 148 N.W.2d 107 (1967).

**4.** Tenn.Code Ann. § 20–5–106 (1980); S.D.Codified Laws Ann. § 21–5–1 (1985 Supp.).

**5.** *See Justus v. Atchison*, 19 Cal.3d 564, 139 Cal. Rptr. 97, 565 P.2d 122, (1977); *Hernandez v. Garwood*, 390 So.2d 357 (Fla.1980); *Kuhnke v. Fisher*, — Mont. —, 683 P.2d 916 (1984); *Egbert v. Wenzl*, 199 Neb. 573, 260 N.W.2d 480 (1977); *Graf v. Taggert*, 43 N.J. 303, 204 A.2d

140 (1964); *Endresz v. Friedberg*, 24 N.Y.2d 478, 301 N.Y.S.2d 65, 248 N.E.2d 901 (1969); *Gay v. Thompson*, 266 N.C. 394, 146 S.E.2d 425 (1966); *Witty v. American Gen. Capital Distrib., Inc.*, 727 S.W.2d 503 (Tex.1987).

**6.** 18–A M.R.S.A. § 2–804(a) and (b) were originally enacted as sections 1 and 2 of chapter 124 of the Public Laws of 1891. Section 1 remains substantially as enacted. R.S. ch. 89, §§ 9, 10 (1903); R.S. ch. 92, §§ 9, 10 (1916); R.S. ch. 101, §§ 9, 10 (1930); R.S. ch. 152, §§ 9, 10 (1944); R.S. ch. 165, §§ 9, 10 (1954); 18 M.R.S. A. §§ 2551, 2552 (1964); 18–A M.R.S.A. §§ 2–804(a), (b) (1981). Section 2 remained substantially as enacted through the 1954 revision and until the amendments described in the text.

removed by the Legislature by amending the 1967 language to read

and in addition thereto, may give damages not exceeding $10,000 for the loss of comfort, society and companionship of the deceased to the persons for whose benefit such action is brought....

P.L.1977, ch. 192 (P.L.1981, ch. 213 raised limit to $50,000). Although there is no pertinent legislative history, it is obvious that the legislative purpose of the 1977 amendment was to extend to the relatives of a deceased adult damages for loss of consortium that previously had been available only to the parents of a deceased minor child.

Further, subsection (b) identifies the beneficiaries of a wrongful death action as "the surviving spouse, if no minor children, and of the children if no surviving spouse, and one-half for the exclusive benefit of the surviving spouse and one-half for the exclusive benefit of the minor children to be divided equally among them, if there are both surviving spouse and minor children, and to the deceased's heirs to be distributed as provided in section 2–106, if there is neither surviving spouse nor minor children."

The query then becomes, could a viable fetus benefit as a minor child or as an heir under section 2–106 of the Probate Code from the wrongful death of a parent or antecedent? Subsection (b) clearly refers to *minor children*. Section 1–201(24) of the Probate Code defines a minor as "a person under 18 years of age." *See also* 1 M.R.S.A. § 72(11–A), (11–B). Section 1–201(3) defines "child" as including "any individual entitled to take as a child under this Code of intestate succession from the parent...." There can be no doubt that any reference to a "child," "heir" or "issue" in the Probate Code as it relates to intestate succession can only be construed as meaning a fetus that is born alive and that survives the decedent by 120 hours. 18–A M.R.S.A. § 1–201; 18–A M.R.S.A. §§ 2–101 to 2–114 (1981 & Supp.1987).

**7.** The only change in these two sections is the substitution of the words "in this chapter" for

To construe the word "person" in section 2–804(a) to allow an action for the wrongful death of a viable fetus and not allow beneficial rights or rights of inheritance to a viable fetus for the wrongful death of a parent or antecedent under section 2–804(b) would be to create an anomaly. It becomes self-evident that because of the language of section 2–804 and its explicit integration into the Probate Code we must avoid this result in order not to do violence to the very fabric of the Probate Code. *See Faucher v. City of Auburn*, 465 A.2d 1120, 1124 (Me.1983) (to determine legislative intent as to section of comprehensive statute court should consider statutory scheme in its entirety).

The language of 22 M.R.S.A. §§ 1594 and 1595 supports our determination that the Legislature intended the word "person" in section 2–804(a) be given its common sense meaning of "one born alive." In 1973, the Legislature for the first time enacted legislation defining a "human person," and identified certain responsibilities toward that person. 22 M.R.S.A. §§ 1575 and 1576 (repealed and replaced by 22 M.R.S.A. §§ 1594 and 1595 (1978)).[7]

Section 1575 provided:

Whenever an abortion procedure results in a live birth, failure to take all reasonable steps, in keeping with good medical practice, to preserve the life and health of the live born person shall subject the responsible party or parties to Maine law governing homicide, manslaughter and civil liability for wrongful death and medical malpractice.

Section 1576 defined a live birth as follows:

"Live born" and "live birth" as used [in this chapter] shall mean a product of conception after complete expulsion or extraction from its mother, irrespective of the duration of the pregnancy, which breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord or definite movements of voluntary muscles, wheth-

"section 1574 and 1575" in present section 1595.

er or not the umbilical cord has been cut or the placenta is attached. Each product of such a birth is considered live born and fully recognized as a human person under Maine law.

This language makes clear that in the context of an abortion procedure it is the live born child, regardless of the duration of the mother's pregnancy with that child, who is protected by our criminal statutes that refer to the taking of the life of a "human being," 17–A M.R.S.A. §§ 201, 202 and 203 (1983 & Supp.1987); it is the live born child that is granted a cause of action for medical malpractice pursuant to those statutes that refer to an "individual," a "person" and a "minor," 24 M.R.S.A. §§ 2501–2961 (Supp.1987); and it is the wrongful death of a live born child that gives rise to a cause of action for the death of a "person" pursuant to 18–A M.R.S.A. § 2–804.

At the time the Legislature repealed the existing wrongful death statute and replaced it by 18–A M.R.S.A. § 2–804, P.L. 1979, ch. 540, approximately 6 years had elapsed since the enactment of sections 1575 and 1576, and approximately twenty-nine states and the District of Columbia had allowed a wrongful death action to be maintained for the death of a viable fetus. This integration of the wrongful death statute into the Probate Code strongly indicates the Legislature's intent not to confer a legal personality on an unborn fetus. We are persuaded by the above discussed legislative history that to read the word "person" in the wrongful death statute to encompass an unborn fetus would be to use the rubric of construction to rewrite the statute. *See State v. Bellino*, 390 A.2d 1014, 1022 (Me.1978) (court interprets a statute by ascertaining express or underlying legislative intent which is controlling).

Accordingly, we hold that the trial court properly granted the defendants' motion for summary judgment as to the wrongful death claim of Hallie Milton, as personal representative of the estate of baby girl

Milton. For the same reason, the claim of the plaintiffs for the loss of filial consortium of their child cannot be maintained. Damages for this claimed loss can be recovered only in the context of the wrongful death action. Thus, the trial court properly granted the defendants' motion for summary judgment on this claim.[8]

The plaintiffs, however, are not without relief. Their complaint against the defendants contains a claim for damages proximately caused by the alleged negligent medical treatment of Hallie Milton resulting in the death of their unborn child, her further medical treatment, the great emotional and mental distress to both plaintiffs and the loss of consortium to Michael Milton, and other damages. Nothing contained in this record warrants summary judgment on these individual claims of the Miltons. *See Gammon v. Osteopathic Hospital of Maine, Inc.*, 534 A.2d 1282 (Me.1987); *Rowe v. Bennett*, 514 A.2d 802 (Me.1986); *Macomber v. Dillman*, 505 A.2d 810, 812–13 (Me.1986).

The entry is:

Judgment as to Hallie A. Milton in her representative capacity and as to Hallie A. and Michael Milton on their claim for filial consortium affirmed.

Judgment on the remaining claims of Hallie A. and Michael Milton vacated. Remanded to the Superior Court for further proceedings consistent with the opinion herein.

McKUSICK, C.J., and ROBERTS and SCOLNIK, JJ., concur.

WATHEN, Justice, with whom NICHOLS, and CLIFFORD, JJ., join dissenting.

I respectfully dissent from the Court's conclusion that an action for prenatal death cannot be maintained under Maine's wrongful death statute. In its opinion, the Court appropriately recognizes that: (1) wrongful death statutes were adopted to correct an anomaly in the law, (2) thirty-five states

---

**8.** Because of our decision herein, we need not address the additional contention of Hallie Milton, in her representative capacity, that the trial court erred in holding that the notice to the

defendants of the wrongful death claim did not comply with 24 M.R.S.A. § 2903 (Supp.1986), repealed and replaced by 24 M.R.S.A. § 2903 (Supp.1987).

have interpreted their statute to allow a wrongful death action on behalf of a fatally injured viable fetus, and (3) only nine states have refused to permit such an action. After announcing those foundational facts, the Court inexplicably declares that it will ignore the rationale adopted in other jurisdictions and confine its analysis to "a reading of our own law to derive its meaning and intent." Having adopted this strangely restricted method of legal analysis, the Court faithfully proceeds through a grudging process of statutory construction and succeeds in producing an anomaly nearly as flagrant as that which originally prompted the adoption of the statute. I would rule that a claim for the prenatal death of a viable fetus is actionable.

In 1891, when Maine adopted the wrongful death statute, there was a general assumption that birth marked the beginning of life. In the last part of the 19th century, Justice Oliver Wendell Holmes wrote an authoritative opinion in which he declined to recognize a fetus as a person and reasoned that because the mother and fetus were physically inextricable they should be considered one entity. *Dietrich v. Northampton*, 138 Mass. 14, 52 Am.Rep. 242 (1884). Justice Holmes' opinion remained unchallenged until 1946, when the concept of viability was introduced in the context of prenatal injuries caused by an act of malpractice. In *Bonbrest v. Kotz*, 65 F.Supp. 138 (D.D.C.1946), the court ruled that a child, viable at the time of injury and later born alive, could maintain an action for prenatal injuries. With *Bonbrest* the separate personhood of the fetus was established, and within three years the Minnesota Supreme Court upheld a wrongful death action for fatal prenatal injuries inflicted upon a viable fetus. *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W.2d 838 (1949). Since 1949, the split of authority noted previously has developed. No useful purpose would be served by a detailed discussion of the divergent opinions in other jurisdictions. It is sufficient to note the point of divergence; namely, is it within the judi-

ciary's function to interpret the statutory term "person" in a context beyond that anticipated by the original legislative scriveners.

Most of the courts included in the majority view have considered the question as appropriately invoking the exercise of the judicial power of statutory construction. Recognizing that actions are almost universally allowed for prenatal injuries, those courts conclude that it would be irrational to prohibit recovery for a more severe injury causing the death of a fetus. *See, e.g. Mone v. Greyhound Lines, Inc.*, 368 Mass. 354, 360–61, 331 N.E.2d 916, 920 (1975); *Presley v. Newport Hospital*, 117 R.I. 177, 187, 365 A.2d 748, 753 (1976). Moreover, the recognition of a fetus as a person is thought to be most consistent with current human experience and knowledge concerning fetal development and the ability of the fetus to survive independently of the mother.[1] *See, e.g., Poliquin v. MacDonald*, 101 N.H. 104, 135 A.2d 249, 251 (1957). Courts that have undertaken the construction of the term "person" have readily concluded that a viable fetus is included within the meaning of that term. Courts holding the minority view, however, have generally declined to permit the action on the theory that to do so would infringe upon the exclusive prerogative of the legislature to create legal rights and interests. *See, e.g., Justus v. Atchison*, 19 Cal.3d 564, 139 Cal.Rptr. 97, 107, 565 P.2d 122, 132 (1977); *Hamby v. McDaniel*, 559 S.W.2d 774, 776–77 (Tenn. 1977). Thus, the issue is primarily a matter of determining the proper bounds of the judicial function rather than a strict question of statutory interpretation.

The wrongful death statute enacted in Maine was modeled after Lord Campbell's Act enacted by the British Parliament in 1846 and is substantially identical to wrongful death statutes enacted in other American jurisdictions. Considering the state of human knowledge at the end of the 19th century, as evidenced by Justice Holmes' pronouncement in *Dietrich*, it is

---

**1.** In this regard, it is interesting to observe that it was Justice Holmes who emphasized the relationship between the development of legal doctrine and human experience. "The life of the law has not been logic; it has been experience." O.W. Holmes, *The Common Law* 1 (1881).

reasonable to conclude that the Maine Legislature did not intend to include a fetus in the definition of person. The only other relevant event in legislative history occurred in 1979, when the statute was incorporated, unchanged, into the Maine Probate Code.[2] Although there had been substantial litigation and discussion in other jurisdictions in the years between 1891 and 1979, this Court had no occasion for any pronouncement.

The Court divines meaning from a century of legislative silence in the face of judicial opinions in other jurisdictions. I am unable to ascribe meaning to legislative silence. In my judgment, the issue should be resolved by determining whether the Legislature intended that the meaning of the term "person" be left to the normal processes of judicial interpretation or whether the Legislature intended that the meaning remain "fixed" as it existed at the time of the original enactment. *See Myrick v. James,* 444 A.2d 987, 991 (Me.1982); *Anderson v. Neal,* 428 A.2d 1189, 1191 (Me.1981). Finding no "explicit legislative direction" that would foreclose our consideration of the meaning of "person," I conclude that the process of defining the term remains a proper judicial function. *Myrick,* 442 A.2d at 989. I readily accept the interpretation adopted by the majority of courts who have considered this issue. To do otherwise would be to perpetuate the outmoded notions that gave rise to the need for the statute in the first instance. As Justice Cardozo stated: "Death statutes have their roots in dissatisfaction with the archaisms of the law .... It would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied." *Van Beeck v. Sabine Towing Co.,* 300 U.S. 342, 350–51, 57 S.Ct. 452, 456, 81 L.Ed. 685 (1937). Unless the Court is prepared to bar a claim for prenatal injury, we are now left with the result that prenatal injury is actionable while prenatal death is not. The absurdity of such a result is usually illustrated by the hypothetical of twins suffering simultaneous prenatal injuries, with one dying moments before birth and the other dying moments after birth. Such an extreme case demonstrates the irrationality of the requirement of a live birth. *See Stidam v. Ashmore,* 109 Ohio App. 431, 434, 167 N.E.2d 106, 108 (1959). *See also* Comment, *Prenatal Injuries—Actions for Wrongful Death—Damages,* 18 Me.L.Rev. 105 (1966).

I would vacate the judgment of the Superior Court on the claim for wrongful death.

---

**2.** The statute was made a part of the Maine Probate Code by P.L.1979, ch. 540, § 1 (effective Jan. 1, 1981). In relevant part, the Code defines "person" as "an individual." 18–A M.R.S.A. § 1–201(29) (1981). Such a circular definition provides no assistance in the present case.